MT. ZION BAPTIST CHURCH AND J. D. ISRAEL *et al.*,. Appellants, v. H. A. WHITMORE *et al.*, Appellees.

1. **Religious Societies:** SUBVERSIVE TEACHINGS: CHURCH PROPERTY: RIGHTS OF MINORITY. The Mt. Zion Baptist Church of Bonaparte, having purchased lots and erected buildings thereon in the year 1852, adopted certain articles of faith as published in the minutes of the Des Moines Baptist Association in 1848. In 1885 the pastor of the church and certain of the members became adherents to the doctrine of "sanctification by a second experience," and, because of differences of opinion arising between the members in respect thereto, charges were preferred against certain of the members who opposed the teaching of said doctrine, and they were excluded from the fellowship of the church. The persons thus excluded, with those sympathizing with them, having assembled and decided that they constituted "the true and original Baptist Church of Bonaparte," called to its service a. pastor, and demanded the possession of the church property, which was refused. By the agreement of the two factions the differences between them in respect to said doctrine of sanctification was submitted to a council of Baptist ministers, which decided that said' doctrine was not in harmony with the teachings of the Baptist denomination, but was subversive of the very end sought by it, and was destructive of the peace of their churches. *Held*, that the adherents of said doctrine of sanctification, though constituting a majority of the whole number of members of said church, could not divert the use of its property to the promulgation of doctrines different from the faith for the advancement of which the church was organized, and that a. court of equity would interfere to protect the minority in having the trust property applied in accord with the original intent.

2. ——: ——: ——: ——. The whole membership of the church having agreed to submit the creed of the church in respect to said doctrine to a council as aforesaid for settlement, *held*, that the decision of the council that said doctrine was not in accord with the Baptist faith was binding upon the majority.

3. ——: ——: ——: ——. The council aforesaid found that the doctrine of sanctification as taught by S. and others was not in harmony with the teachings of the Baptist denomination, and recommended that the doctrine nevermore be taught in said church. Thereupon at a meeting of the church representing the entire membership, the said action of the council was accepted. Subsequently, however, the church annulled its former action, and rejected the action of the

council as to the finding and recommendation aforesaid, but accepted it in other respects. *Held,* that the evidence warranted the finding that the defendants believed in said doctrine as taught by S., and that it was their purpose to teach it in the church.

*Appeal from Van Buren District Court.*—Hon. Dell Stuart, Judge.

### Monday, June 1, 1891.

This is an action to enjoin the defendants from an unlawful use of church buildings and records. There was a decree for the defendants, and the plaintiffs appeal.—*Reversed.*

*Craig, McCrary & Craig* and *Sloan, Work & Brown,* for appellants.

*Wherry & Walker,* for appellees.

Granger, J.—The Mt. Zion Baptist Church was organized in October, 1842, and incorporated in December, 1851, and is located at Bonaparte, in Van Buren county. In 1852 it became the owner of lots 10 and 11, in block 12, in Bonaparte, and has erected buildings thereon for the use of the society, including a church and parsonage. The articles of association provide that "the articles of faith and church covenants published in the minutes of the Des Moines Baptist Association in the year 1848 shall be the articles of association adopted by this church, together with such rules of order as we may, from time to time, adopt, and the same is hereby adopted." In 1885, because of the teachings of one Aura Smith and his brother, of an experience or condition of "sanctification by a second experience," or "sinless perfection," there were differences of opinion and trouble among the

*(margin note: 1. Religious societies: subversive teachings: church property: rights of minority.)*

members of the church. The pastor of the church, Rev. C. L. Custar, one H. A. Whitmore and others, were regarded as adherents of the doctrine thus taught, and placed under charges of heterodoxy, with a request that a council of ministers and deacons be convened to hear and adjust the complaints. The persons thus charged were, at a regular meeting of the church, without trial or investigation, exonerated from the charge by a motion for that purpose. This action was had on the seventh of January, 1888. On the fourth of February thereafter charges were preferred against J. D. Israel, L. H. Mills, J. H. Murphy, Mrs. Troutman and Mrs. Cox, who were of those opposing the alleged new doctrines. The charges were as follows:

"*First*. For disregard of authority; refusing to submit to the requirements of the church; setting aside the authority and majority of the church in its actions and rulings. *Second*. For contention and strife; causing division; being leaders of evil; destroying the peace of the church; attempting to divide the church. *Third*. For false witness; testifying to things known to the church to be entirely false, against Bro. C. L. Custar and other members of the church in good standing."

There was no trial upon the charges, but the church proceedings show as follows: "The charges are of such a nature as to require immediate action, and motion to exclude the parties named from the fellowship of the church carried." The record from this forward recognizes two "factions" in the church,—one designated as the "Whitmore Faction," and the other as the "Israel Faction;" and they are so generally spoken of in the record and arguments, the Whitmore faction being largely in the majority. On the sixth of June, 1888, the Israel faction, about fifteen in number, assembled at the house of Mr. Israel, and, because of the difficulties existing in the church, caused by the

false doctrines being taught in the church by the "former pastor, Rev. Custar, and other members of the church   *   *   *   namely, sanctification, a second blessing, especially to be sought for, and sinless perfection, and by using unscriptural discipline," decided that they constituted "the true and original Baptist Church of Bonaparte;" and it is this organization, with certain of its members, that are parties plaintiff for and on behalf of those having a common interest; the defendants being H. A. Whitmore and others, for and on behalf of those "associating and acting with them." The Israel faction, after deciding that it was the church, called to its service as pastor Rev. J. L. Cole, and sought the possession and use of the church building and property then in the possession of the Whitmore faction, which was refused. On the first of August, 1888, a council of seven Baptist ministers assembled at Bonaparte, at the joint call of the two factions, and the following is the record of the matters to be submitted to it:

"The statement of reasons for calling the council was read by the minority, of which the following is a synopsis:

"'First. That two brothers, William and Aura Smith, being professedly ministers of the gospel, came into our midst early in 1885, preaching the doctrine of entire sanctification and sinless perfection, inviting all professing Christians to seek this experience, and ridiculing Christians who failed to accept this invitation, and finally urging those who did accept this invitation to attend holiness prayer-meetings. That Bro. C. L. Custar, a former pastor of this church, and several members of this church followed after these Smith brothers, and accepted the aforesaid doctrine. Second. That Brother Custar taught this doctrine from the pulpit of this church. That a holiness prayer-meeting was organized in the spring of 1885, and carried on till

May, 1888. That members of this church professed entire sanctification, neglecting the regular meetings of this church for holiness meetings. That this doctrine became a means of disturbance and alienation of feeling among the members. *Third.* That the teaching and acceptance of this false doctrine has been a cause of the difference of opinion and of the action of a minority in organizing the new body, and claiming to be the real Bonaparte Baptist Church.

" '[Signed]            J. D. ISRAEL,
" ' And others.'

"Reasons for calling a council were read on behalf of the majority party, of which the following is a copy:

" ' The Bonaparte Baptist Church organized the council to examine its faith and practice; its faith with reference to the doctrine of sanctification; its practice or discipline with regard to the exclusion of certain members of the church, who have since formed another organization, and claim to be the original and true Bonaparte Baptist Church. We want to know if we have so far departed from the church once delivered to the saints that we can no longer be recognized as a regular Missionary Baptist church. We desire to know wherein we have wronged those whom we have excluded, that we may confess the same, and do all in our power to repair the broken house of our beloved Zion.

" ' [Signed]            H. A. WHITMORE,
" ' C. L. CUSTAR,
" ' Committee.' "

J. D. Israel and H. A. Whitmore, as "leaders," and on behalf of their respective factions, signed the following:

"For the sake of peace and harmony, and for the glory of our common Lord, it is hereby agreed that the findings and recommendations of this council shall be accepted as final, and in the fear of and by the help of

God, we will carry them out in spirit, as well as in letter.

"[Signed]                    J. D. ISRAEL,
                     " H. A. WHITMORE."

Each party selected a person to conduct the examinations in its behalf, and the record states that the examination was "thorough, satisfactory and conducted in good spirit." Revs. Cole and Custar were appointed to receive the decision of the council, "on behalf of their parties, respectively," and afterwards the council unanimously returned the following findings:

"*First.*  We find that the doctrine of entire sanctification, taught by the Smith brothers, Miss Rornack, and confessedly, also, by Bro. C. L. Custar, in the church, is not in harmony with the teachings of the Baptist denomination, which deny instantaneous sanctification, the so-called second blessing, and sinless perfection. We hold to a true spirituality in our churches; to a high standard of Christian living; to progressive attainment and growth in grace. On the other hand, we hold that the doctrine of entire sanctification is subversive of the very end sought; destructive of the peace of our churches, in some instances destroying the churches themselves; and should be avoided as a deadly error. We are rejoiced at the noble stand taken by Bro. C. L. Custar in confessing his error in respect to this doctrine, and we trust that juster views of scripture teaching, on this point, may prevail in this church and community.

"*Second.*  The council recommend that the teaching of the above erroneous doctrine of second experience, or entire sanctification, be taught in this church no more, forever; and that the teaching of it in this church, or permitting it to be taught in the church, is a just cause for church discipline.

"*Third.*  We find that the exclusion of the three

members of the choir was justifiable and regular, and
we recommend to the young ladies that they make suitable acknowledgment to the church.

"*Fourth.* We find that the exclusion of J. D.
Israel, L. H. Mills, James Murphy, Mrs. C. O.
Troutman and Mrs. J. W. Cox was hasty and unjustifiable. We recommend that the action of the church
in excluding them be at once rescinded."

At a regular meeting of the church, August 19,
1888 (both factions, as we understand), the decision of
the council was, on motion, accepted; and the action
of the church in expelling J. D. Israel and others, on
the fourth of February, was rescinded. At a meeting
of the church, on the tenth of September, 1888, the
church annulled its action of August 19; and again,
on the third of November, it took action on the findings of the council separately, and rejected numbers
1 and 2, being those with reference to the doctrine of
sanctification. The petition recites the substance of
the foregoing, and contains averments that the defendants, and those associated with them, have departed
from the faith and practice of the Baptist church, and
are using the church building and records for the benefit and promotion of doctrines and a faith contrary to
and in violation of the faith, covenants and practice of
the Baptist denomination, to maintain which the said
church was organized and the buildings erected. The
relief sought is, that the defendants be restrained from
interfering with the plaintiff in the free use of the
church buildings and property for their legitimate use
as a place of worship, and teaching the doctrines of
the denomination. The answer puts in issue the allegations of the petition, that the defendants have
departed from the faith and practice of the Baptist
church, and are using the church property, or records,
for a purpose in violation of the teachings and doctrines of the denomination, and deny that the plaintiffs

are denied the free use thereof for any legitimate purpose.

The council found the doctrine of "entire sanctification," as taught by Smith brothers, was "not in harmony with the teachings of the Baptist denomination," but "subversive to the very end sought," and "destructive of the peace" of the churches. The correctness of this doctrine as a rule of faith and observance in the Baptist church was in dispute between the factions. It was not, as indicated by appellees' argument, a question of the truth or falsity of the doctrine on scriptural authority, but it was in accord with, or subversive of, the covenants and practice of the Baptist church, with the limitations imposed by its articles of association? This was a purely theological question, and a council of theologians from that church was a proper tribunal to determine such a question, and was so recognized and agreed upon by the parties. It is, however, contended by the appellees that they are not bound by this finding of the council, and we notice their reasons, or at least some of them. Much stress is laid upon the fact that each Baptist society is an independent body, with no higher ecclesiastical authority for its control; that its form of government is congregational where a majority govern; and that it is within itself "a little republic." It should be borne in mind that it is the distinctive character of the *Baptist church government* that is relied upon to make it an exception, and free it from the generally expressed rule of law, by which a minority of an association may claim its property against a majority seeking to divert it from its legitimate use. A quotation from appellees' argument will indicate clearly the objection to be met. It is said: "Yes, we repeat again if this church or any other Baptist church desires to change its 'articles of faith' or belief, it may do so, if a majority of its members

concur therein.   If it desires to change to a Mormon
church it may do so, and no person or persons, no man
or body of men, either civil or ecclesiastical, has any
right to interfere.   It owes no allegiance to any man
or body of men, except a majority of its own members.
It has no creed except the Bible, and the right of its
own members to interpret that according to the dictates
of their own consciences.   If a majority of the mem-
bers of that church believe the Bible to teach a certain
doctrine, then that is 'Baptist doctrine,' because that
church has the right and the power to determine for
itself what the Bible teaches, and no other church or
churches has any right to interfere therein.   The
Baptist as a denomination, have no creed.   There is
no such thing as a one Baptist church with a one
Baptist creed or belief.   All there is of 'Baptist creed'
consists in the right of each separate church to inter-
pret the Scriptures for itself, and to say for itself what
it believes the Scriptures to teach.   There are as many
'Baptist churches' as there are several societies or con-
gregations.   There are as many 'Baptist denominations
or creeds' as there are several societies or congregations
which have given expression to their belief of what the
Scriptures teach."   Afterwards follows the conclusion:
"We conclude, then, if there be a difference of opinion
between the plaintiffs and defendants as to what the
Bible teaches with reference to sanctification, and the
defendants are in a majority and plaintiffs a minority,
according to Baptist practice and usage there is but one
remedy, namely, 'they may retire, and find a home in
some other church; or they may organize themselves
into a new one.'"   This exclusiveness of government
within the strict lines of ecclesiastical authority may be
conceded; but we are constrained to doubt that any
writer, either upon ecclesiastical or civil law, where a
controversy involved the right of a minority of an
association to have its property devoted to the purpose

for which it was given or granted, has laid down a rule so broad. As we think these statements and the conclusion lay at the foundation of other errors into which the appellees have fallen, a brief consideration of them, and some rules of law, will render a consideration of many questions unnecessary.

Let it be understood at the outset that we are not adjudicating the right of any person to a religious belief or practice, nor are we to determine the truth or falsity of the doctrine of "sanctification," or "sinless perfection." Upon authority so general as to be beyond question it is held, that property given or set apart to a church or religious association, for its use in the enjoyment and promulgation of its adopted faith and teachings, is by said church or association held in trust for that purpose, and any member of the church or association, less than the whole, may not divert it therefrom. The following cases more or less directly sustain the rule, and are but a few of the many bearing on the question: *Kniskern v. Lutheran Church*, 1 Sandf. Ch. 439; *Attorney General v. Pearson*, 3 Mer. 353; *Baker v. Fales*, 16 Mass. 487; *Stebbins v. Jennings*, 10 Pick. 172; *Hale v. Everett*, 53 N. H. 9; *Lawyer v. Cipperly*, 7 Paige, 281; *Baptist Church v. Witherell*, 3 Paige, 296; *Harrison v. Hoyle*, 24 Ohio St. 254; *Field v. Field*, 9 Wend. 401; *Gable v. Miller*, 10 Paige, 627; 2 Denio, 492; *M. E. Church v. Wood*, 5 Ohio, 284; *Happy v. Morton*, 33 Ill. 398; *Lawson v. Kolbenson*, 61 Ill. 407; *Dublin Case*, 38 N. H. 459; *Watson v. Jones*, 13 Wall. 679; *Fadness v. Braunborg*, 73 Wis. 257; 41 N. W. Rep. 84; *Presbyterian Church v. Congregational Soc.*, 23 Iowa, 567. The Mt. Zion Baptist Church came into possession and ownership of the property it now holds under a profession of faith and practice limited by the "articles of faith and church covenants published in the minutes of the Des Moines Baptist Association in the year 1848," which we understand to accord

with the teachings of the Baptist denomination. These articles of faith and church covenants, and the teachings with which they accord, are a limitation on the trust or use to which the property may be applied. Nice distinctions or shades of opinion on doctrinal points or practice do not merit the interference of a court of equity, and it is only when the departure from the faith is so substantial as to amount to a diversion of the property from the trust purpose that courts will interfere. The council selected by the parties declared, in effect, the doctrines taught by Smith brothers to be a deadly error, and destructive of the peace of the church. Treating this finding for the present as legitimate and true for the purposes of the case, and the situation is that property given and devoted to the promotion of the Baptist church is being used for its destruction. The appellees' contention because of their claims for the distinctive or independent character of the Baptist church, by which a majority may, without limitation, govern, would permit this result. They take the Scriptures as the only limitation upon or authority over the power of the church, both as to spiritual and material affairs, within the church; and wherein the members may differ the majority control, without reference to the original purposes of their association. The error of appellees in their claim for the "independency" of the majority in a Baptist church lies in a mistaken conception of what should be understood by "government." The power of the majority to govern is derivative, and the source of derivation limits the power. The organization gave birth to the church, and a power to govern the church. The church is Baptist because of the faith and covenants that make it so. It is not the faith and covenants that need or are to be governed, but the members in the enjoyment and fulfillment of the same. The power to govern the church gives no power to change the

church or the faith and covenants that fix its character. The property of this church is the common property of all its members, and each has such an interest therein that he may insist that it shall be devoted to the religious faith for which it was given. The manner of the application is delegated to the judgment of a majority of the members of the church, but there is no delegation of authority to the majority to apply it to the advancement of a church of another faith by a direct transfer, or by changing the faith of a majority of the members of the church. It is when such an attempt is made that a court of equity will interfere to protect the rights of a minority in having the trust property applied in accord with the original intent. In *Schnorr's Appeal*, 67 Pa. St. 138, it is said: "When the founders or donors have clearly expressed their intention that a particular set of doctrines shall be taught, or a particular form of worship and government maintained, it is not in the power of individuals having the management of the institution at any time to alter the purpose for which it was founded." In the same case it is further said: "In church organizations those who adhere and submit to the regular order of the church, local and general, though a minority, are the true congregation." *Roshi's Appeal*, 69 Pa. St. 462; *Rottman v. Bartling*, 35 N. W. Rep. (Neb.) 126. If, perchance, a bare majority of some Baptist church should determine, on scriptural authority, their right to a plurality of wives, and, against the protests of a minority, devote the property of the church to the advocacy and practice of such a doctrine, under the claim of appellees that the church "owes no allegiance to any man or body of men," civil or ecclesiastical, except a majority of its members," the only redress of the minority would be to retire from the church, and leave the property to the majority for such a purpose. Such a surrender of civil rights is without support on

any principle of natural justice, and we believe without the sanction of any judicial tribunal. We, of course, treat and understand the arguments and claims of parties as to the law to be applicable to the property interest of a church, for it is the only question involved in this suit.

It is said in *Schnorr's Appeal, supra,* in a very similar connection, that "the guaranty of religious freedom has nothing to do with the property. It does not guarantee freedom to steal churches." The thought, with no intent or reason to impute a criminal or dishonest purpose in this case, is not without application to the marvelous freedom from interference claimed for a majority in a Baptist church, because of a congregational or independent form of government. It is further said in the same connection that such freedom "secures to individuals the right of withdrawing, forming a new society with such creed and government as they please, raising from their own means another fund, and building another house of worship; but it does not confer on them the right of taking the property consecrated to other uses by those who may now be sleeping in their graves." Mt. Zion Baptist Church was organized in 1842, and prospered, without dissension, till 1885, when this new doctrine, which had not before been taught or recognized in the church, was introduced. With its introduction began trouble, resulting in a division of the church upon religious faith as justified by the Bible. Not alone the finding of the council, but the record on other grounds, leads to the conclusion that, at the organization of the church and long after, it was not thought of as a doctrine of faith or belief in the church. The newness and singularity of the doctrine in that church and community seemed to render it one for especial teaching and information, leading to the holding of "holiness meetings;" and the truth of such religious experience was in dispute among professing

christians, and especially in the Baptist church.   Copi-
ous citations from the Scriptures and from religious
treatises are made in support of a doctrine of sanctifi-
cation which it is neither our province to deny or affirm.
It is likely true that one purpose of these citations is to
show that the sanctification, the teaching of which the
council found to be a deadly error, was not that taught
by the defendants, but that it was a doctrine of sancti-
fication in accord with the teaching of the Baptist
church, which fact will be hereafter noticed.

II.   It is urged that the findings of the council are
without force, and not binding upon the defendants or
on this court, because the church knows
no tribunal except the church itself, and
hence the action of the council is void.   But has not
this independent body a right to act for itself,—to agree
upon a lawful method of adjusting any differences it
may have?   Where is the power to gainsay its right to
do so?   We do not hold, for it is not our province,
that for the purpose of church observance the findings
of the council are obligatory.   Such is purely a matter
of ecclesiastical direction and authority; but the eccle-
siastical question there determined, as to the fact
of the doctrine taught by Smith brothers being error
against the faith of the church, we think is con-
clusively settled, and that it may be shown in the civil
courts, in matters of which they take jurisdiction, when
material to the question at issue.   A reference to the
reasons for calling the council shows this doctrinal
question to have been in dispue, and the majority
recognized itself as a party to a controversy on a doc-
trinal question, the settlement of which was for the "sake
of peace and harmony, and for the glory of our com-
mon Lord."   It was by common consent a method of
settling the creed of the church, and their acts in this
respect, being of all the members, are as available in
the civil courts to protect property rights as are their

acts at the organization of the church in fixing its creed and character. It will be observed that we are not holding that the recommendations of the council are of like effect, nor are we attaching legal signification to them. They do not go to the conditions that fix property rights with which we deal. After the majority has recognized itself a party to a controversy that should be settled in the interest of peace and harmony, the claim that it should itself sit in judgment to determine the controversy is somewhat novel. The minority lay at the door of the majority the charge of heresy. The majority says: "We constitute the church. All power is vested in the church, and hence in us. We determine that the charge is false." This is the precise claim made by the appellees as to the power of a majority, and it is the precise action taken by the appellees as a majority in Mt. Zion Baptist Church, after which the council was called, the action of which it would now repudiate. In view of this, the claim of the majority that "if it desires to change to a Mormon church it may do so, and no person or persons, no man or body of men, either civil or ecclesiastical, has any right or power to interfere," is not strange. The position leads to this: Consider the majority of a particular Baptist church as guilty of the grossest violations of and the widest departure from the church covenants and faith. Being accused by the minority, the accused sit in judgment, which it declares in its favor, and then pleads the judgment it declares as conclusive of its innocence, because no other man or body of men has authority to interfere. However such a rule may serve in purely ecclesiastical relations, we unhesitatingly say the civil law will not adhere to it where the result is to divert trust property from its proper channel.

III. But it is said the council did not find that defendants believed or taught the doctrine of sanctifi-

3. —: —: —: cation as taught by Smith brothers, and it is true that it is not in terms so found, although the inference is quite conclusive. If it was so found, the same reasons would not exist for our treating it as conclusive as in case of the doctrinal point before discussed. The inquiry as to the conduct of the defendants involves that before and after the proceedings of the council, and becomes a fact for us to find from the evidence. The evidence, independent of the finding of the council as to the extent the doctrine was believed and taught except as to a few, including the pastor, who at or before the sitting of the council confessed his error, would leave us in serious doubt on this question but for what transpired after the sitting. On the nineteenth of August the church (including the defendants) accepted the action of the council in pursuance of their agreement, and to this and the subsequent action of the church we attach much importance in determining the fact. The council had only found that the particular doctrine of sanctification taught by Smith brothers was error, and the acceptance of the finding reached to no other doctrine. The recommendation that it be taught no more in the church was only the "above erroneous doctrine." On the tenth of September the church by action annulled its action of August 19, and again November 3, by further action, it rejected the action of the council as to said finding and recommendations, and accepted it in other respects. Thus it is seen that the majority organized as a church has in effect declared its adherence to the erroneous doctrine, and refused to abide by the recommendation that it should not be further taught in the church. If the doctrine taught by Smith brothers was not that entertained by defendants, why reject the finding that it was error? If it was not the intention to teach it in the church, why reject the recommendation that it

should not be further taught? This conduct of the majority, in the light of other facts, is quite conclusive, to our minds, of both its belief in the doctrine and its purpose to teach it in the church.

But as a reason for the action of the church in repudiating the findings it is said: "The church had no right to sign the agreement, because it cannot delegate its authority, and the signing of the agreement was disloyalty to Christ, and a surrender of the cardinal principle of Baptist practice; namely, church independence." There is a seeming inconsistency between the language and conduct of the majority in this respect. The disloyalty to Christ appears to have been in making the agreement to abide by the action of the council, because of a surrender of principle. But the majority rejects part of the findings of the council and accepts other parts, one of which was favorable to it. We do not see how to sustain the appellee's claim, except upon the theory that the disloyalty in making the agreement depended on the character of the findings under it, which we do not think would be claimed.

It is again said: "For the defendants to have accepted these findings would have been for them to admit not that they were teaching or intending to teach any such doctrine, but that C. L. Custar, their former pastor, to whom they had given a letter of recommendation to a sister church, had been teaching the doctrine of sinless perfection." But Rev. Custar was present at the meeting of August 19, when the church accepted the action of the council, and took his letter of dismission at that time, and took part in the proceeding, favoring the acceptance; and the findings, which he was a committee of the majority to receive, show that he had been confessedly a teacher of the same doctrines as Smith brothers, and confessed his error. How can we, in the light of such a record,

accept the claim of the majority that in rejecting the finding and recommendation they were acting in the interest of the pastor? Other claims are made, as that the parties were by the council required to sign the agreement, which was wrong, but nothing in the record shows but that it was not entirely voluntary as to all parties.

It is further said that the action of a council is only advisory, and that it is never binding. The rule, as claimed, has the support of ecclesiastical authorities, but the agreement in this case made it more as to its effect on the property interests of the church. It is a question entirely different from that pertaining to conscience, or the general rules for church government, as to which the authorities cited have especial reference. It should be kept in mind, to avoid misapprehension, that we have only treated the findings of the council as conclusive, in so far as, by an agreement of the entire body of the church, it determined a dispute as to its former faith or creed.

We reach the conclusion upon the facts in the case that the majority have made a substantial departure from the original faith and covenants of the church, and have diverted the property from the purpose for which it was given or granted. In *App v. Lutheran Congregation*, 6 Pa. St. 201, it is said: "It is the duty of the court to decide in favor of those, whether a minority or majority of the congregation, who are adhering to the doctrine professed by the congregation, and the form of worship in practice, as also in favor of the government of the church in operation, with which it was connected at the time the trust was declared." *McGinnis v. Watson*, 41 Pa. St. 9; *Sutter v. Trustees*, 42 Pa. St. 503. In deciding who is entitled to control the church property where there is such a division, we must look to the situation when the dispute began. In *Roshi's Appeal*, citing the above author-

ities, it is said: "The title to the church property of a divided congregation is in that part of it which is acting in harmony with its own law; and the ecclesiastical laws, usages and principles which were accepted among them before the dispute began are the standard for determining which party is right." Thus aided by authority upon the facts as we find them, we are not in doubt as to our duty. The minority, when pressed from the church by the departure of the majority, having the church organization were justified in taking measures by organization to preserve the identity of the church and its property interests, and under the law were entitled to its use and control. It is only by placing it there that the trust will be observed, and the cause is remanded to the district court for a decree to that effect. REVERSED.