McBRIDE, Judge.
From a judgment of the trial court perpetuating a preliminary injunction restraining and prohibiting the defendants from permitting, in any manner, mixed or family seating in Chevra Thilim Synagogue (Congregation Chevra Thilim), defendants have appealed.
*672 Plaintiffs, as members of Congregation Chevra Thilim, brought this suit against the corporation and also the other defendants, in their capacities as duly constituted officers and members of the Board of Directors thereof, alleging' that said defendants had violated the precepts of the “halachas” by permitting seating in mixed or family groups in the synagogue and praying that they be restrained from such conduct. Plaintiffs averred that since its establishment in 1887 Congregation Chevra Thilim had always strictly adhered to the precepts of the halachas contained in the “Talmud” (the chief body of Jewish tradition which in turn is based upon the interpretation of the Hebrew scriptures, particularly the “Torah” or great body of Mosaic law), and that in accordance with the halachas, it is forbidden to worship in a synagogue where men and women sit together, because such synagogue, under the orthodox Polish Jewish tradition, has no “kedusha” or congregational sanctification. It is also alleged that family or mixed seating is contrary to the purposes for which Congregation Chevra Thilim was organized and also in contravention of the conditions of the Rosenberg trust (hereinafter fully discussed).
The appeal taken by defendants was made returnable to the Supreme Court, but that court being of the opinion it had no jurisdiction of the subject matter, exercising its discretion, transferred the appeal to us. See 238 La. 915, 117 So.2d 56.
As a defense the defendants deny that there is any “religion” known as “The Orthodox Polish Religion,” and, therefore, they deny the allegations and conclusions set forth in the petition. It is also further averred by defendants that Congregation Chevra Thilim has always followed the principles of and has been loyal to the traditions of Judaism and has always, and to the present time, followed its charter and by-laws.
The record in the case consists of three volumes of pleadings and testimony, plus a great number of exhibits. In connection with his judgment perpetuating the injunction prayed for by plaintiffs, the trial judge, the late Frank J. Stich, handed down comprehensive and well-documented reasons therefor. We are in accord with his findings both of fact and conclusions of law, and we, after carefully reviewing the record as a whole, have decided to make said reasons of the trial judge, together with certain observations of our own, the opinion in this case.
The reasons for judgment given by the trial judge read as follows:
“ * * * The Court was particularly concerned with the plea to the jurisdiction ratione materiae, and, after very mature and deliberate consideration of the law and the evidence, overruled same under the authority of Watson v. Jones, 13 Wall. [679] 80 U.S. 679, [20 L.Ed. 666] (1871) (and the other authorities hereinafter cited) decided by the United States Supreme Court, which had before it, for the first time, an ecclesiastical dispute which arose out of the conflicting claims of two factions within a church congregation to the parish property, after a schism had occurred within the congregation. Mr. Justice Miller, in a very learned opinion, classified church controversies which come before the civil courts into three categories and laid down the rules by which civil courts should be governed when deciding ecclesiastical controversies. He stated on pages 722-724 [of 13 Wall.]:
“ ‘We are next to inquire whether the decree thus rendered is based upon an equally just view of the law as applied to the facts of this controversy.
“ ‘The questions which have come before the civil courts concerning the rights to property held by ecclesiastical bodies, may, so far as we have been able to examine them, be profitably classified under three general heads, which of course do not include cases governed by considerations applicable to a church established and supported by law as the religion of the state.
*673 “ ‘1. The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support, or spread of some specific form of religious doctrine or belief.
“ ‘2. The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.
“ ‘3. The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization.
“ ‘In regard to the first of these classes it seems hardly to admit of a rational doubt that an individual or an association of individuals may dedicate property by way of trust to the purpose of sustaining, supporting, and propagating definite religious doctrines or principles, provided that in doing so they violate no law of morality, and give to the instrument by which their purpose is evidenced, the formalities which the laws require. And it would seem also to be the obvious duty of the court, in a case properly made, to see that the property so dedicated is not diverted from the trust which is thus attached to its use. So long as there are persons qualified within the meaning of the original dedication, and who are also willing to teach the doctrines or principles prescribed in the act of dedication, and so long as there is any one so interested in the execution of the trust as to have a standing in court, it must be that they can prevent the diversion of the property or fund to other and different uses. This is the general doctrine of courts of equity as to charities, and it seems equally applicable to ecclesiastical matters.
“ ‘In such case, if the trust is confided to a religious congregation of the independent or congregational form of church government, it is not in the power of the majority of that congregation, however preponderant, by reason of a change of views on religious subjects, to carry the property so confided to them to the support of new and conflicting doctrine. A pious man building and dedicating a house of worship to the sole and exclusive use of those who believe in the doctrine of the Holy Trinity, and placing it under the control of a congregation which at the time holds the same belief, has a right to expect that the law will prevent that property from being used as a means of support and dissemination of the Unitarian Doctrine, and as a place of Unitarian worship. Nor is the principle varied when the organization to which the trust is confided is of the second or associated form of church government. The protection which the law throws around the trust is the same. And though, the task may be a delicate one and a difficult one, it will be the duty of the court in such cases, when the doctrine to be taught or the form of worship to be used is definitely and clearly laid down, to inquire whether the party accused of violating the trust is holding or teaching a different doctrine, or using a form of worship which is so far variant as to defeat the declared objects of the trust. In the leading case on the subject, in the English courts, of the Attorney-General v. Pearson, (3 Merivale, 353), Lord Eldon said, “I agree with the defendants that the religious belief of the parties is irrelevant to the matters in dispute, except so far as the King’s Court is called upon to execute the trust.” That was a case in which the trust-deed declared the house which was erected under it was for the worship and service of God. And though we may not be satisfied with the very artificial and elaborate argument by which the chancellor arrives at the conclusion, that because any *674 other view of the nature of the Godhead than the Trinitarian view was heresy by the laws of England, and any one giving expression to the Unitarian view was liable to be severely punished for heresy by the secular courts, at the time the deed was made, that the trust was, therefore, for Trinitarian worship, we may still accept the statement that the court has the right to enforce a trust clearly defined on such a subject.’
“The trust and donation principle enunciated in Watson v. Jones, ever since it was handed down by the Supreme Court in 1871, has been followed by the vast majority of jurisdictions throughout the United States. State ex rel. H. W. Soares v. Hebrew Congregation ‘Dispersed of Judah,’ 31 La.Ann. 205 (1879). Slaughter et al. v. New St. John Missionary Baptist Church, 8 La.App. 430 (1928); Crowden v. Dieu Nous Protege Benev. Mut. Aid Ass’n, 146 So. 710 (La.App.1933); State ex rel. Johnson et al. v. Tulane Ave. Baptist Church [La.App.], 144 So. 639 (1932); Harmon v. Dreher, 1 Speer’s Equity, 87 (S.C.), (1843); First English Lutheran Church of Oklahoma City et al. v. Evangelical Lutheran Synod of Kansas and Adjacent States [10 Cir.], 135 F.2d 701 (1943); Ward et al. v. Crisp et al. [189 Tenn. 513], 226 S.W.2d 273 (1949); Shattuck et al. v. Wood Memorial Home, Inc., et al. [319 Mass. 444], 66 N.E.2d 568 (1946); Mt. Zion Baptist Church et al. v. Whitmore et al. [83 Iowa 138], 49 N.W. 81, 83 [13 L.R.A. 198] (1891); Parker et al. v. Harper et al., 295 Ky. 686, 175 S.W.2d 361 (1943); Luttrell et al. v. Potts, et al. [Ky.], 257 S.W.2d 542 (1953); Reid v. Johnston, 241 N.C. 201, 85 S.E.2d 114 (1954).
“The case of Katz et al. v. Goldman et al., 33 Ohio App. 150, 168 N.E. 763 (1929), which was very heavily relied upon by the defendant in this case in support of their plea to the jurisdiction, is inapposite to this case because there was no trust involved in the said case. The court at page 765 [of 168 N.E.] stated:
*“ * * * and there is no stipulation appearing in the record, or any other class of testimony, which shows that there is any other specific trust incumbent upon the tribunal of the "church to execute except the trust that is to be exercised for the benefit and advantage of the church, and under these circumstances we think the great weight of authorities is to the effect that the majority of the membership of the church, acting in the way specified, has control of the right to the use of its property for the purposes for which it was instituted. This doctrine is laid down in Kenesaw Free Baptist Church v. La[t]timer, 103 Neb. 755, 174 N.W. 296, 8 A.L.R. 98, which bears directly upon that portion of the prayer which asks this court to impose terms relating to the trust alleged to the effect that the church property should be used for the purpose of promoting the cause of traditional or orthodox Judaism.
“ ‘In relation to church property there may be a dedication by way of trust to propagate definite religious doctrines, and in such case it is the duty of the Court to see that the property so dedicated is confined by way of management for the purposes of the trust. At least it must not be diverted from such a trust.’
“Since a trust and donation, a civil right, was shown to exist, the Court maintained jurisdiction and overruled a plea to its jurisdiction ratione materiae.
“The plaintiffs have alleged and proven:
“That Chevra Thilim Congregation was incorporated on July 27, 1887, by act before William H. Pascoe, notary public, (then referred to as Hebrew Congregation Chebra Thilim) and reincorporated, because of the disappearance of the original act of incorporation, on August 31, 1897, by act before Felix J. Dreyfus, notary public.
“Article III of said charter states the objects and purposes to be:
“ ‘The objects and purposes of this corporation are declared to be the worship of God according to the orthodox Polish Jewish Ritual, the establishment of a ceme *675 tery for the burial of its members and their family and such other persons as may be designated in the by-laws, and the practice of charity.’ (Exhibit P-1)
“On February 8, 1949, by act before H. L. Midlo, notary public, the said charter was amended and in said amendment it was stated:
“ ‘Who did further declare that the said meeting was attended by ISO members, which number of members in attendance exceeds two-thirds of the total membership of the corporation in good standing as of January 12, 1949, the date of said meeting.’ (Exhibit P-1)
“That on August 12, 1915, by act before Frederick C. Marx, notary public, Benjamin Rosenberg, a member of Chevra Thilim Congregation, executed a donation inter vivos of the buildings and improvements which he had caused to be erected on the real property located on Lafayette Street in the square bounded by Carondelet, Baronne and Girod Streets, at a cost to said donor of $13,000.00; that said donation was made subject to the following terms and conditions:
‘“(A). That the said building and ground shall never be mortgaged or encumbered by any lien or privilege, neither shall same be sold, but if at any time it becomes necessary to sell said building and the property on which same is located then the proceeds derived from the sale thereof shall be immediately reinvested in the purchase of a new site and the erection of a new building, but should the building be destroyed by fire or other causes, then and in that event the funds derived from said destruction shall be used to rebuild upon the present site or to acquire a new site and erect a building thereon, provided that in the event of sale and the selection of a new site the same shall only be made upon the approval of at least two-thirds of the members of said Congregation, who have been members thereof for at least one year prior to the proposed action being taken.
“‘(B). That the said building shall only be used as a place of Jewish worship according to the strict ancient and orthodox forms and ceremonies.
“‘(C). That the lower floor or basement may be used for other than religious purposes by the Jewish residents of this City, upon obtaining the consent of the Board of Directors of said Congregation and upon complying with the rules and regulations adopted by the said Board of Directors.
“‘(D). That in the event of a new building and site being acquired with the money derived from the sale or destruction of the present building and site, then the said new building and site shall be subject to all of the above terms and conditions, and the said building shall always be called the “Chevra Thilim Synagogue”.’
“That Nathan Sherman, President of Chevra Thilim Congregation, Accepted the said donation for and on behalf of said congregation, having been authorized by resolution of the membership of said congregation to do so. (Exhibit P-2)
“That at a meeting of the Board of Directors of the Chevra Thilim Congregation held on April 12, 1943, in furtherance of the acquisition and construction of the New South Claiborne Avenue Synagogue (the present location of Chevra Thilim Congregation) a motion was made and unanimously adopted that the congregation receive and accept the South Claiborne Avenue building site from the Uptown Site & Building Fund of Congregation Chevra Thilim, an organization which was not incorporated until March 1, 1944, as evidenced by charter passed before Herman L. Midlo, notary public, on said date, under the following terms and conditions:
“ T. That there shall be constructed on or before the expiration of five (5) years from the date that the Congress or the President of the United States of America shall declare the end of hostilities and peace signed, an appropriate house of worship or synagogue on said parcel of *676 ground for the worship of God according to the Orthodox Polish Jewish Ritual.
“ ‘2. That any and all associations or auxiliaries which shall have use of said real estate and improvements thereon must include as part of their name and style the words: “Congregation Chevra Thilim”.
“‘3. That the house of worship and synagogue and parcel of real estate shall hear the title of and designation as: “Congregation Chevra Thilim”.
“ ‘4. Neither the real estate nor the improvements to he constructed thereon shall ever he sold or exchanged without the joint consent of two-thirds ($i) of the membership of record and two-thirds (%) of the Board of Directors of record. No repairs, alterations or improvements shall ever he erected without the necessary cost funds being in the bank to pay for such repairs, alterations or improvements; it being the intention of the donors that this real estate and the improvements thereon shall never he encumbered with any liens, mortgages or privileges.’ (Exhibit P-4)
“As will appear by reference to Article II of the Charter of the Uptown Site & Building Fund of Congregation Chevra Thilim, dated March 1, 1944, the objects and purposes of the said corporation are declared to be:
“ ‘The holding and administering of property real, personal and mixed for religious purposes solely to raise and accumulate funds to build a synagogue on the uptown site purchased and owned by Congregation Chevra Thilim as per acts before the undersigned Notary, dated April 13, 1943 and April 16, 1943, and registered in C.O.B. 524 folio 445 and C.O.B. 526 folio 360, or on any other location in the uptown area of New Orleans.’ (Exhibit P-3)
“And in Article VII of the said charter of the Uptown Site & Building Fund of Congregation Chevra Thilim it is stated:
“ ‘All persons who have and shall contribute funds for the purpose set forth hereinabove in Article II of this Charter, shall have the right to have returned all funds to them or their heirs and assigns should the project not go into effect in accordance with the resolution of April 12, 1943, of Congregation Chevra thilim pertinent parts of same read as follows:
“ ‘1. That there shall be constructed on or before the expiration of five (5) years from the date that the Congress or the President of the United States of America shall declare the end of hostilities and peace signed, an appropriate house of worship or synagogue on said parcel of ground for the worship of God according to the Orthodox Polish Jewish Ritual.
“ ‘2. That any and all associations or auxiliaries which shall have use of said real estate and improvements thereon must include as part of their name and style the words: “Congregation Chevra Thilim”.
“ ‘3. That the house of worship and synagogue and parcel of real estate shall bear the title of and designation as: “Congregation Chevra Thilim.”
“ ‘4. Neither the real estate nor the improvements to be constructed thereon shall ever be sold or exchanged without the joint consent of two-thirds (^) of the membership of record and two-thirds (%) of the Board of Directors of record. No repairs, alterations or improvements shall ever be erected without the necessary cost funds being in bank to pay for such repairs, alterations or improvements; it being the intention of the donors that this real estate and the improvements thereon shall never be encumbered with any liens, mortgages or privileges.
“ ‘5. It is understood that the following designated gentlemen have the right to take any and all legal action necessary in order to effect the reversion of the property to the donors, in the event your congregation should not comply with the above conditions :
“ ‘Marx Jeffer, Alternate, Jack M. Pulit-ser Harry Katz, Alternate, Max Singer-man.’ (Exhibit P-3)
*677 “From the foregoing, therefore, it will readily be seen that the worship of God was to be according to the ‘orthodox Polish Jewish Ritual’; that the donation made by Benjamin Rosenberg on August 12, 1915, and accepted by Chevra Thilim Congregation, was subject to the specific conditions ‘that the said building shall only be used as a place of Jewish worship according to the strict ancient and orthodox forms and ceremonies’, and ‘that in the event of a new building and site being acquired with the money derived from the sale or destruction of the present building and site, then the said new building and site shall be subject to all of the above terms and conditions, and the said building shall always be called the “Chevra Thilim Synagogue”.’
“The Board of Directors of the Congregation on January 9, 1957, by resolution authorized the institution of family or mixed seating, which resolution reads in part as follows:
“ ‘The following resolution was adopted by the Religious Committee.
“ ‘Whereas the present administration of the Congregation Chevra Thilim was elected on a platform to plan and to implement family seating in the synagogue, and
“ ‘Whereas the Religious Committee believes that this plan must be implemented immediately for the welfare of the Congregation.
“ ‘Therefore be it resolved that the Board of Directors approve the implementation of a family seating plan immediately and that a meeting of the general congregational membership be called as soon as suitable arrangements can be made to register maximum membership sentiment concerning this action.’ (Exhibit P-7)
“Thereafter, on January 23, 1957, plaintiffs instituted this suit for injunction as hereinabove set forth.
“It is plaintiffs’ contention that the only issue for determination by this court is whether the practice of mixed or family seating in Chevra Thilim Synagogue is contrary to and inconsistent with the ‘orthodox Polish Jewish Ritual’ and ‘Jewish worship according to the strict ancient and orthodox forms and ceremonies’, and therefore in violation of the trust and donation imposed by Benjamin Rosenberg in the act of donation hereinabove referred to, the donation by the Uptown Site & Building Fund, and also the Charter of the Congregation.
“The defendants contend that the Board of Directors had the legal right to institute family or mixed seating without the authority of the general membership of the congregation, that is, without a two-thirds vote or any vote of the membership.
“Article VII of the Charter provides that the Charter may be amended, altered or changed by a vote of two-thirds of the members in good standing, and it reads as follows:
“ ‘This charter may be amended, altered or changed, of the congregation may be dissolved, by a vote of two-thirds of the members in good standing of said congregation, at a special meeting called for that purpose; provided that the proposed amendment, change or alteration or dissolution shall have been announced at a meeting of said Congregation held prior to the special meeting.’ (Exhibit P-1)
“Defendants’ contention that an amendment to the Charter was not necessary, but, even if it was, it only required two-thirds of the members present and voting at a meeting, is not sound. Article VII of the Charter means that it requires two-thirds of the entire membership of the Congregation to amend, alter, or change the Charter, and so much so, that on February 8, 1949, when the Congregation amended its Charter by act before Herman L. Midlo, notary public, it placed its own interpretation on this Article when it provided in the said amendment:
“ ‘Who did further declare that the said meeting was attended by 150 members, which number of members in attendance exceeds two-thirds of the total membership *678 of the • corporation in good standing as of January 12, 1949, the date of said meeting.’
“The evidence shows that the defendants on two occasions attempted to obtain the consent of the Congregation by placing the matter before the general membership in congregational meeting assembled. On the first occasion May 2, 1956, less than a majority voted for mixed or family seating, but on the last occasion, February 24, 1957, subsequent to the filing of this suit, the vote was as follows:
“ ‘Total Eligible Voters 322 Out of this the following ballots were cast: Votes
For Family Seating VO Go
Against Family Seating C 00
Not voting
Total Ballots Cast VO CM
For Rabbi Greenberg o
Against Rabbi Greenberg Cn
Not voting
262’ Total Votes Cast
(Exhibit D-l)
It will be noted that the total number of eligible voters was 322 and that only 193 voted for family seating, which is a majority of the membership, but not two-thirds.
“In order to amend the Charter it requires a vote of two-thirds of the total membership, that is, all of the members in good standing, and, therefore, the vote at the meeting of February 24, 1957, during the pendency of this suit, was not a compliance with the Charter and is indicative of the fact that two-thirds of all the members of the congregation do not want family or mixed seating.
“This case consumed eight days of actual trial. The Court gave great latitude to both plaintiffs and defendants in order to obtain all possible evidence upon which to base its decision in this matter, because the Court well realized that this case belongs to a class, happily rare in our courts, involving a religious controversy, and that ordinarily courts will not pass upon questions involving ecclesiastical matters unless a trust and donation, a civil right, is involved. But unquestionably it does exist and, therefore, the Court must perform its duty and function as in other cases.
“The question posed is whether mixed or family seating is inconsistent with, contrary to and violative of Jewish worship according to the ‘orthodox Polish Jewish Ritual’, and the ‘Jewish worship according to the strict ancient and orthodox form and ceremonies’, to which Chevra Thilim Congregation is dedicated under its Charter, the trust, and the donations hereinabove referred to.
“Plaintiff produced four Orthodox Rabbis, who are all outstanding scholars and authorities on Judaism, being Rabbi Solomon J. Sharfman of Brooklyn, N. Y., President of the Rabbinical Council of America; Rabbi David Hollander of Bronx, N.Y., past President of the Rabbinical Council of America; Rabbi Eliezer Silver of Cincinnati, Ohio, Past President of the Union of Orthodox Rabbis of the United States and Canada and presently Chairman of its Presiduum; and Rabbi Samson R. Weiss of Brooklyn, N.Y., National Director of Young Israel and Executive Vice-President of the Union of Orthodox Jewish Congregations. All of these experts, as stated, are scholars and authorities on Judaism and all agree that the separation of the sexes in an Orthodox Jewish Synagogue is a basic and fundamental doctrine of the Orthodox Jewish Law. There are differences of opinion as to what is the proper type or kind of separation, or ‘mechitzah’, and, therefore, Orthodox Jewish Rabbis are not in complete agreement as to what is a proper separation or ‘mechitzah’. Some find one type of separation acceptable and others find other type acceptable, but all Orthodox Rabbis, both in the United States and abroad, are in agreement that there must be some type of separation between the men and the women in an Orthodox Jewish Synagogue. If men and women are seated together side by side in a synagogue, that *679 synagogue has no separation of any kind, and, therefore, such a synagogue .lacks the necessary sanctity, called ‘kedusha’, and is not an Orthodox Jewish Synagogue. The foregoing is not only substantiated and corroborated by the-four experts produced by the plaintiffs, but also by the 75 affidavits of Rabbis (Exhibits P-13-97).
“The plaintiffs also produced the declaration (affidavit) of Rabbi Isaac Halevi Her-zog, Chief Rabbi of Israel and Presiding Judge of the Superior Rabbinical Court, which states that:
“ T, the undersigned, Isaac Halevi Her-zog, Chief Rabbi of Israel and presiding Judge of the Superior Rabbinical Court,, having been requested to give my considered opinion and ruling on a question-of Jewish ritual specified below, do hereby declare and say as follows:
“ ‘The 'separation of men and women in synagogue during worship is an essential tenet of the Jewish religion. Mixed seating arrangements without a properly constructed mechitza (separation) are absolutely prohibited under the canons of Hebrew law.’ (Exhibit P-108)
“Plaintiffs also produced a declaration (affidavit) executed by the Secretary of the. Chief Rabbi of the United Hebrew Congregations of the British Commonwealth of Nations at the direction of the Chief Rabbi, which reads as follows:
" ‘I am directed by the Chief Rabbi of the United Hebrew Congregations of the British Commonwealth of Nations, to state that the institution of mixed pews in Synagogue, is forbidden, as the sitting together of men and women during Divine Service in Synagogue is contrary to Jewish religious law.
“ ‘A properly constituted orthodox Synagogue must not introduce any innovation in the Service of the Synagogue which is repugnant to Jewish law and practice.’ (Exhibit P-109)
“Plaintiffs further offered lay testimony to show the type of separation which exists in Chevra Thilim Congregation. The Court, at the request of both Counsel for plaintiffs and defendants, visited the Chevra Thilim. Synagogue, as well as two other synagogues, as will appear from the record.
“There is testimony that Judaism is divided into three major classes: Orthodox, Conservative, and Reform. The Court is. here concerned with Orthodox Judaism.
“Defendants produced as witnesses Rabbi' Jacob Agus of Baltimore, Md., and Rabbi' David Aronson of Minneapolis, Minn., both being Conservative Jewish Rabbis and very learned scholars and authorities on Judaism.' It is not necessary to analyze in detail the testimony of these two experts, but suffice it to state that it is the Court’s apprecia-* tion of their testimony that, while they do not agree with the strict orthodox interpretation of the Jewish Law, Scriptures and Text, they do agree that under the strict Jewish orthodox interpretation of Jewish Law, Scriptures and Text, men and women are forbidden to sit together without a separation in an Orthodox Jewish Synagogue.
“Defendants attempted to show that Congregation Chevra Thilim has not followed a)l of the principles of Orthodox Judiasm in that, when the synagogue was constructed in 1949, they deviated from some of the ’ principles of Orthodox Judaism in such matters as the lack pf a center bimah, an elevated platform in the center of the synagogue. However, the experts all testified that such fact does not affect the sanctity of the synagogue.
“Defendants further contend that there has been no radical departure in the Jewish' doctrine by Chevra Thilim- Congregation ■ since 1949 by the institution of family or-mixed seating in January, 1957, because since 1949, when the new synagogue was constructed and dedicated, there has been a ‘mingling’ of the sexes.
“What the Court is called upon to decide in this case is whether or not the ac- •, tion of the Board of Directors, in instituting family or mixed seating was con-. trary to and inconsistent with the objects, and purposes for which the Congregation . *680 was organized and the conditions of the donations made by Benjamin Rosenberg and the Uptown Site & Building Fund of Congregation Chevra Thilim.
“The evidence shows that the women are separated from the men by an aisle 4 feet in width and that the pews in which the women sit are located on an elevated platform 6 inches higher than those used by the men and that the ends of the pews, which adjoin and abut the aisle, are 39 inches in height from the platform to the top of the pews, and, further, that these women’s pews consist of two sections, each of which is located on the sides of the synagogue abutting the side walls.
“The evidence further shows that the practice of separation of the sexes in Chev-ra Thilim Congregation was in effect since it was founded in 1887 up to the time that the Board of Directors, by its resolution on January 9, 1957, instituted family or mixed seating.
“The Court is, therefore, of the opinion that since family or mixed seating in Chevra Thilim Synagogue is contrary to and inconsistent with the ‘orthodox Polish Jewish Ritual’ and with ‘Jewish worship according to the strict ancient and orthodox forms and ceremonies’, and is in violation of the trust imposed by Benjamin Rosenberg, and the Uptown Site & Building Fund of Congregation Chevra Thilim, to which said Chevra Thilim Synagogue and Congregation is dedicated, the Board of Directors had no right or authority to institute family or mixed seating on January 9, 1957; and, further, that since the dedication and trust hereinabove mentioned do exist, and so long as it can be carried out, the Congregation is bound thereto and thereby must abide by same.”
The exception of no cause of action, as well as the plea to the jurisdiction of the court ratione materiae, was reurged in argument before us. There is no question that the plea to the jurisdiction ratione materiae of the lower court was properly overruled for the reasons stated by the trial judge. In support of the exception of no right or cause of action, it is the defendants’ contention that there is nothing involved in the case save and except a purely religious controversy and that the plaintiffs possess no right or causé of action to seek redress in the premises from a court of civil jurisdiction. This exception was correctly overruled by the trial court as is pointed out above, under the circumstances existing in the case, the plaintiffs may submit such matters as they complain of for a judicial determination.
The trial judge accepted the testimony of the four Orthodox rabbis who were produced by plaintiffs as experts on Judaism. They are outstanding scholars and their testimony receives corroboration from the seventy-five affidavits of other rabbis. Contrary to the averments of defendants’ answer, it appears from the evidence there is “Polish Orthodox Judaism,” and the term refers to the way the Jews in Poland lived and in Poland the Jews were Orthodox. As their experts the defendants produced Rabbi Jacob B. Agus and Rabbi David Aronson, undoubtedly learned men, but their testimony does not seem to be as impressive and does not carry as much weight as does the testimony of the four Orthodox rabbis who appeared in behalf of plaintiffs, for the reason that Rabbi Agus is “Conservative” and unaffiliated with any Orthodox Rabbinical Organization, and Rabbi Aronson, while claiming to be “orthodox”, meaning “right thinking,” pointed out specifically that he spells the word Orthodox with a small “o” rather than with a capital “O.” His description of Judaism is as follows:
“Judaism is a stream; tradition goes on as a river. It takes on new currents here and there but it is the same river. It may get deeper in one spot, it may get shallower in another spot; it is always changing; always. If you take the viewpoint of world Jewry, there never probably was a time when it was standardized in toto. * * * ”
*681 Rabbi Aronson stated that to the “best of my knowledge” there are no rules of separation in the synagogue.
The question whether mixed seating is obnoxious and contrary to the precepts of Orthodox Judaism has concerned courts in other jurisdictions in at least two cases, and in each one the court held that Jews, under the Orthodox Law, are forbidden to participate in religious services where there is a mixed seating of the sexes.
In the case of Davis v. Scher, 356 Mich. 291, 97 N.W.2d 137, 141, the court said:
«* * * (j) that this congregation was an Orthodox Jewish Congregation; (2) that under the Orthodox Jewish Law Orthodox Jews cannot participate in services where there is mixed seating; (3) that if mixed seating was enjoyed in this congregation Orthodox Jews would be prohibited from participating in services there. Clearly plaintiffs would be deprived of their right to the use of their synagogue — in other words deprived of the right of the use of their property and the use of the property by the majority group contrary to law. * * * ”
In the case of Fisher v. Congregation B’Nai Yitzhok, 177 Pa.Super. 359, 110 A.2d 881, 882, plaintiff, an ordained rabbi of the Orthodox Hebrew faith, entered into a contract with defendant to officiate as cantor at the synagogue at six special services for $1,200. The congregation up to that time had been conducted without mixed seating of the sexes. On the eve of moving into a new synagogue the practice of separate seating by defendant was modified, and when plaintiff was informed of such action, he notified the defendant that he, as a rabbi of the Orthodox faith, would be unable to officiate as cantor. Defendant refused to rescind its action and plaintiff refused to officiate and brought the suit for the balance of the contract price and recovered judgment for the amount due.
Quoting from the court’s opinion:
“ * * * On behalf of the plaintiff there is evidence that under the law of the Terah and other binding authority of the Jewish law, men and women may not sit together at services in the synagogue. In the orthodox synagogue, where the practice is observed, the women sit apart from the men in a gallery, or they are separated from the men by means of a partition between the two groups. * * *
“ * * * Judge Smith accepted the testimony of three rabbis learned in Hebrew law, who appeared for plaintiff, to the effect: ‘That Orthodox Judaism required a definite and physical separation of the sexes in the synagogue.’ And he also considered it established by the testimony that an orthodox rabbi-cantor ‘could not conscientiously officiate in a “trefah” synagogue, that is, one that violates Jewish law’; and it was specifically found that the old building which the congregation left, ‘had separation in accordance with Jewish 'Orthodoxy.’ * *”
Judge Stich also commented on the fact that Congregation Chevra Thilim had not adhered to all of the principles of Orthodox Judaism in that the synagogue lacks a center “bimah” (an elevated platform in the center of the synagogue), etc. Such is a fact, but even so, defendants have no warrant to disregard the conditions of the Rosenberg trust, and the failure to follow all of the principles of Judaism’s dictates would not work an estoppel against the plaintiffs or debar them from seeking to' preserve an important tenet of Orthodox Judaism, namely, the separation of the sexes at worship, which, under the trust, should be observed.
In Visitors of Theological Institution in Phillips Academy in Andover v. Trustees of Andover Theological Seminary, 1925, 253 Mass. 256, 148 N.E. 900, 918, the court said:
*682 "The' trustees point to various instances where in past years the visitors have relaxed from strict adherence to the requirements of the Associate and Additional Statutes. These relate to requirement of subscription to the creed without qualification by professors arid in other matters. All these matters, giving them collective forcé, are not enough to bar'the visitors from asserting the position which they here take. We need ,not consider whether circumstances might arise which would work something in the nature of ari es-toppel against the visitors. -Generally it is true that no length of time of •diversion from the plain provisions of -a charitable foundation will prevent its restoration to its true purpose. * * ”
The present seating arrangement has served as the mechitzah in Chevra Tmlim Temple since the erection of the'Building in about 1949, and undoubtedly ‘ the members of the congregation have believed that such arrangement was in keeping with the Jewish, traditions regarding a mechitzah, and we do not think that it would be proper at this time for a group in the synagogue to take steps to abolish the mechitzah now existing altogether and permit family or mixed seating, which, as the weight of the evidence clearly indicates, is anathema to Orthodox Judaism.
We are sure of being legally correct in stating that in this case where we find a definite trust to keep faith in a particular religious creed, no action of any faction of defendants’ congregation, even by a huge majority vote, can serve to amend the charter in order to bring about a diversion of the use of the synagogue to a purpose other than provided in the charter and also as stipulated in the act of donation by Benjamin Rosenberg. Even the slightest minority of the congregation who abide by the conditions of the trust would have i a standing in a court of justice to prevent the property from becoming wrongfully diverted or given over to a use not contemplated by the dpnor.
For the reasons assigned, judgment appealed from is affirmed.
Affirmed.