KATZ ET AL. *v.* GOLDMAN ET AL.

(Decided September 30, 1929.)

*Mr. W. J. Hamilton* and *Mr. Charles Higley,* for plaintiffs.

*Messrs. Stanley, Horwitz & Kiefer,* for defendants.

SULLIVAN, J. This cause is here on appeal, and a motion is made for judgment on the pleadings, consisting of the amended petition and the answer. It is based upon Section 11601, General Code of Ohio, which provides that, when a party is entitled by law to judgment in his favor upon the statements and the allegations of the pleadings, judgment should be so rendered by the court, notwithstanding the verdict has been found against such party. By the pleadings the contest grows out of certain controversies arising from practices in religious faith of the congregations named amongst other defendants in the case, and the question to be decided is whether from the pleadings the issues are purely religious and ecclesiastical, and, if so, whether this court has any jurisdiction or power to interfere with the conduct and practices of a congregation acting under the guidance and supremacy of the duly constituted authorities, as established by the constitution, rules, regulations, customs, practices, and precedents relating to a religious body. The plaintiffs, Abraham A. Katz and others, represent one view, and the defendants, Solomon Goldman and others, who appear to be in a large majority, hold a contrary view in regard to the practices of their faith, as carried on by the authorities representing the congregation mentioned, through the duly constituted board of officers and trustees named amongst the large number of defendants.

To the amended petition a demurrer was filed, and overruled by another branch of the Court of

Appeals while sitting under designation in this district, but that does not relieve this court from the responsibility of passing upon the motion now filed for judgment upon the pleadings, and it is claimed that a decision by a Court of Appeals sitting in Lucas county by designation, since the overruling of this demurrer, changes the status as it existed at the time of the overruling of the motion. This decision is found in the case of *Altvater* v. *Meck,* 29 Ohio Law Rep., 290.

In the case just cited the principle which has been laid down so many times is repeated and revived, that in matters of religious differences a court of equity will not interfere where there is power within a body duly constituted by the church to settle and conclude the subject in controversy. It is a well-settled rule of law that courts will not interfere with ecclesiastical questions involving differences of opinion as to religious conduct, and especially where the members of the congregation in question have created by organic law a tribunal of their own for the settlement of differences, whose finality is supreme judgment.

Regardless, however, of this Lucas county case, it becomes our duty to pass upon the question of the motion for judgment upon the pleadings, regardless of any former action of another Court of Appeals, even sitting in this district, which overruled a demurrer that was filed against the pleading of the plaintiffs.

It is well, before proceeding further, to look at the prayer of the petition. We are asked to decide that a trust was imposed upon the church property; that the property should be used for the purposes

of promoting the cause of traditional or orthodox Judaism. We are asked to define that language and to hold that the conduct of the defendants in control of the church property has been a defiance of this trust; we are further asked to find that the old constitution of March, 1917, is still in full force; and we are requested to declare that the new constitution is void, and that the election of trustees, officers, and rabbi, selected under the same, is also void. A further prayer is that the trustees and officers of defendants in office and in possession of the church property prior to the election of 1924 be reinstalled in office, that the property be put in their possession, that all the defendants be permanently enjoined from promulgating doctrines or holding services in the church property contrary to the terms of the trust, that they be prevented from interfering with plaintiffs when promoting in said church the cause of orthodox or traditional Judaism, and that plaintiffs be awarded all other relief to which they may be entitled in equity.

Thus it will be seen that an attempt is made to substitute for the governing power of the congregation a judicial tribunal, whose duty it shall be to assume guardianship over the rights and ceremonies of the church and to become sponsor and guide for the promulgation of the faith of the members and the practices and ceremonies by which the religious services are conducted. In other words, the courts would become the theologians and the monitors directing and controlling the practices indulged in by the membership, and the controlling force in determining whether there was a conformity to the principles of orthodoxy or traditional Judaism.

The prayer of the amended petition in the respects just outlined is a refutation of the right relied upon for the injunctive relief in this case, because under the Constitution not only of the nation, but of the state, and under the universal decisions of our courts, there can be no disturbance or limitation to the power and right to exercise that freedom of conscience which is the basis of our liberty, which doctrine is incorporated in the Bill of Rights.

The right to worship according to the dictates of the conscience is predicated upon the theory that courts cannot interfere in the conduct of the members of congregations practicing their religious faith under prescribed forms, rules, and authorities in a manner not in violation of express legal authority or antagonistic to the enjoyment by others of their natural rights. And when we consider the prayer of the petition as above outlined, there is but one reasonable conclusion, and that is that if the prayer were granted the members of the congregation in question would be worshiping, not according to the dictates of their own consciences and the rules of the ecclesiastical authorities, but according to the dictates of a judicial tribunal, which, under all the authorities, has no right, power, or jurisdiction in the presence of a final church tribunal to assume the monitorship of the religious faith of the members of the congregation or the citizens of a community.

There is a dead line which is an impregnable barrier to a judicial tribunal, and that is the right of a congregation to the conduct of its worship in such form and manner and with such ceremony as agrees with the constituted authorities of the church, which embodies the spirit, the will, and the consent of the

members who created and adopted the constitution, by-laws, and regulations, the precedents and established customs, which determine the processes which constitute that religious worship originally designated by the organization of the members and the creation of a tribunal which was designated and intended to be the final arbiter in questions concerning the exercise and practices of the faith of the general body. So far as the record discloses, the board of trustees had finality of judgment, and the conduct of the church and the promulgation of the faith was in accordance with the judgment, decrees, and decisions of that body, and, this being so, the court is rendered powerless, in our judgment, to interfere in these matters purely religious and ecclesiastical.

There is nothing in the record that forbids the conclusion that the church in question is congregational and independent in its character and administered exclusively by and within itself in accordance with the rule of the majority of its membership, as expressed in the election of its governing body, and there is no other purpose deducible from the record except that it is an institution for the purpose of ecclesiastical government, holding property by way of purchase or donation, and there is no stipulation appearing in the record, or any other class of testimony, which shows that there is any other specific trust incumbent upon the tribunal of the church to execute except the trust that is to be exercised for the benefit and advantage of the church, and under these circumstances we think the great weight of authorities is to the effect that the majority of the membership of the church, acting in the way specified, has control of the right to the use of its prop-

erty for the purposes for which it was instituted. This doctrine is laid down in *Kenesaw Free Baptist Church* v. *Latimer,* 103 Neb., 755, 174 N. W., 296, 8 A. L. R., 98, which bears directly upon that portion of the prayer which asks this court to impose terms relating to the trust alleged to the effect that the church property should be used for the purpose of promoting the cause of traditional or orthodox Judaism.

In relation to church property there may be a dedication by way of trust to propagate definite religious doctrines and in such case it is the duty of the court to see that the property so dedicated is confined by way of management for the purposes of the trust. At least it must not be diverted from such a trust.

To promote the cause of traditional or orthodox Judaism is not a definite religious doctrine based upon any principle so stationary in its character that a court would be warranted in defining the exact course to pursue or in granting the prayer of the petition in this respect. It is plain from the record that there is such a multitudinous variety of opinions in regard to orthodoxy and traditional doctrine that it would be impossible to grant any relief that would not be confusing and chaotic in its character, and thus is made apparent the impossibility of definitely defining a course; and, especially, when an appeal is made to a judicial instead of an ecclesiastical tribunal, does it appear inevitable that to define a distinct course of conduct is beyond the bounds of possibility and reason. The property in question, known as the "Jewish Center," on East 105th street, Cleveland, Ohio, was acquired by pur-

chase for the general purposes of the congregation. It is contrary to the theory of distinguished counsel for plaintiffs that the property is ingrafted with a trust from which there can be no departure. This so-called trust is necessarily religious. It is based upon the propagation of the faith according to the judgment of the ruling authority, and in this case that would be the board of trustees, because the congregation is an independent organization, owing no loyalty to a higher body, and there is no evidence in the record that the congregation is part of any other organization under the authority of judicatory tribunals.

The rules which apply to such a situation have their basis in *Watson* v. *Jones,* 80 U. S. (13 Wall.), 679, 20 L. Ed., 666, which appears to be one of the strongest cases, and upon which most of the other cases rely for the maintenance of the proposition herein discussed, making an ecclesiastical decree supreme within its constituency, even as against the powers of the courts, where the tribunal itself has final judgment. The use of the property therefore is to be determined by the principles which govern ordinary voluntary associations, which are that the majority rules, that the action of the governing body is final if within the constitution, and that there is no body to which an appeal can be made.

If a minority chooses to separate itself and form a distinct body, and refuses to recognize the authority of this final tribunal, the situation is lamentable, but it is due to the rule of the church by the chosen rulers of the congregation. As was laid down in the case just quoted, the religious opinion which dissents from the governing body admits of no inquiry, and

the reason is apparent, for, if such inquiry was the right of the minority, then the minority, instead of the majority and the officers of the church, would rule the congregation and its course. In the absence of any such trust imposed upon the property, there arises no implication against the power of the regularly chosen authority, even though that body follows in succession to previous bodies that established otherwise, providing that body has kept within the rules and powers of the constitution. It seems to be the unquestioned authority in this country, with respect to questions of discipline, faith, or religious rules or customs, that legal tribunals must accept the decisions of the religious governing body as final and binding upon them when application similar to the one at bar is made. Bearing upon this subject we quote the following paragraphs from *Watson* v. *Jones,* 80 U. S. (13 Wall.), 679, at page 728, 20 L. Ed., 666:

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite them-

selves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

"Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches) has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so."

*Brundage* v. *Deardorf* (C. C. A.), 92 F., 214, follows the ruling in the case just quoted, and the essence of the decision is that, while equity will not

permit a perversion of the trust given to a congregation or church with some particular creed or dogma in view, so long as there are agencies provided by the membership itself within the body to carry out the uses intended, yet where the property held by the church is conveyed by sale for a valuable consideration there is no trust, express or implied, for a specific form of worship ingrafted providing the principles of the faith are maintained and enforced; and, in the instant case, whatever changes in the form or manner of worship may appear, from a reading of the record the main purposes, beliefs, religion, and faith remain generally and substantially the same, and form a foundation that does not and cannot crumble, even though there are dissenting opinions, provided that in substance and in form, generally speaking, the original purpose, principles, and faith are preserved and maintained.

In *Brundage* v. *Deardorf, supra,* certain members withdrew and claimed property which the church had bought, on the ground that a majority of the membership had departed from the principles and purposes of the church. The higher tribunal within the church had ruled contrary to their claim, just as in the instant case the board of trustees chose to control the congregation in accordance with the general purposes of its institution, even though its action produced certain dissensions. We read from the opinion of Lurton, J., on page 227 of the *Brundage case,* which is very applicable to the case at bar, and we think controlling: "This brings us to the controlling question upon which our decision must turn, namely: What effect will a civil court give to the interpretation and construction by the

highest judicatory of an ecclesiastical body of its own fundamental law? Is that judgment subject to review in the civil courts? Or, will the civil courts accept the interpretation placed upon the organic law of the church by its highest judicatory, and apply the law so interpreted to the settlement of property questions depending upon that law? As we have already stated, the property here involved was not devoted by the express terms of any grant, gift, will, or sale to the support of any specific religious dogma, doctrine, or belief, but is property acquired by the church for the general use of the society for religious purposes, and with no other limitation. The property here in question is held for the particular use of a congregation, which is only one of numerous others united to form a general body of churches, and subject to the ecclesiastical control of the general conference, whose jurisdiction extends to all congregations composing the general body. The question here presented is merely one of identity—which of the two bodies claiming to be the legitimate successor of the original united organization is the legal successor of the body to which this property was conveyed? When this question is answered, the property must be awarded to that organization."

In *Helm* v. *Zarecor* (D. C.), 213 F., 648, 657, Justice Sanford, then United States District Judge, in following the general authorities, used the following language, where there were two factions, involving the welfare of a Presbyterian church: "The corner stone upon which these opinions are, in my judgment, to be based, is the decision in *Watson* v. *Jones* (U. S.), *supra,* in which, after careful consideration,

it was held by the Supreme Court of the United States that where in a controversy in a civil court, the property rights of a religious organization are dependent *upon a question of doctrine, discipline, ecclesiastical law, rule, custom or church government that has been decided by the highest tribunal within the organization to which it has been carried, the civil court will accept that decision as conclusive, and will be governed by it in its decision of the case before it.*"

In the instant case we find that the complaints of plaintiffs are not of such a nature that they apply to the fundamental and doctrinal belief in such way as will create an implied trust and result in the conclusion that there has been a perversion of the original purpose. Even if all the complaints of the plaintiffs are well founded, it still remains as an insurmountable fact that the congregation, resulting from the merger of the two churches named as defendants, is well founded on the Jewish faith and rests upon the general tenets of the Jewish religion. There must be, in order to grant the relief prayed for, such a perversion and diversion of the original principles and purposes upon which the church was founded as would either partially or totally destroy the institution as a Jewish identity, and while all points of orthodoxy and traditional Judaism may not be carried out according to a unanimity of opinion, yet, so long as the primal elements of these doctrines remain undisturbed as tenets and principles of the Jewish faith, a minority differing upon this point is ineffectual. If this were not true, the differences of opinion as to administration in many churches and many religions would be the destruc-

tion of the institutions themselves, for it is a matter of common knowledge that difference in opinion in different religious bodies as to the administration of the rules of the church is no uncommon occurrence. The remedy, if the majority power exists, is in the re-election of successors that may conform, or the discharge of leaders whose acts and conduct within the church are not in accord with the dissenting opinion. This rule runs through all organizations, whether civil or religious, and is the underlying principle by which institutions are held together.

The prayer for this court to adopt a rule by which the congregation in question shall abandon its present administration and conform to the doctrine of traditional Judaism and orthodoxy, even if this legal tribunal had the right to interfere in religious matters, for which provision has been made as to control within the church itself, is incapable of being granted for the reason that every member of the congregation of the church in question might have a different view as to what this doctrine is in all its various phases, and with these conflicting opinions it would be impossible to lay down a rule which a board of trustees could follow, because in order to do so the religion would have to be as definite as a science; and, even with respect to a science, it would be impossible to do so, because of the diverging opinions that exist among scientific men upon scientific principles. Certainly this court could not define Jewish orthodoxy and traditional Judaism except from the testimony of experts, and it is an inevitable fact that such an inquiry would result in multiplying dissension, instead of eliminating it. We are content to follow the universal rule that, where the

remedy is within the church itself, a judicial tribunal cannot interfere in matters that form the prayer of this petition.

It is unquestionably true that the purposes of plaintiffs in error are of high character, and their devotion to what they believe to be their religious rights is very commendable. Their respect for the ancient faith of their fathers is worthy of the highest praise, but, while all these things are true, yet the judgment of the church through its regularly ordained ecclesiastical body is the remedy which they themselves have provided and which undoubtedly they are bound to follow. This remedy should be exhaustive. It is very questionable whether that fact exists in this case, but, however that may be, we rest content upon the authorities cited for our action in the case.

Therefore it is our judgment that the motion for judgment on the pleadings should be granted, and the entry may be drawn accordingly.

*Decree accordingly.*

VICKERY, P. J., and LEVINE, J., concur.