they should be shielded from the punitive force of the law.

As was aptly stated by the district judge:

"No one in authority * * * solicited the defendants to commit any crime. The evidence was abundant that it was the defendants who did the solicitation."

Thus, the application of the legal principle to the evidence results in the judicial conclusion that the defense of entrapment is not well founded. The court *a quo* properly admitted the evidence of the crime charged.

For the reasons assigned, the convictions and sentences are affirmed.

127 So.2d 515

Harry KATZ et al.

v.

Gus SINGERMAN et al.

No. 45311.

Feb. 15, 1961.

Rehearing Denied March 20, 1961.

Weinstein & Bronfin, Robert Weinstein, Sylvan J. Steinberg, Martin L. C. Feldman, Herman & Herman, David L. Herman, Midlo & Lehmann, Herman L. Midlo, Beryl E. Wolfson, New Orleans, for defendants-applicants.

Gertler, Hart & Duran, David Gertler, New Orleans, for plaintiffs-appellees.

SUMMERS, Justice.

We granted certiorari here to review the decision of the Court of Appeal of Louisiana, Parish of Orleans (now Fourth Circuit) under our supervisory jurisdiction. See Katz v. Singerman, 238 La. 915, 117

So.2d 56; also, Katz v. Singerman. La. App., 120 So.2d 670.

We concur with the Trial Court and the Court of Appeal on the following findings of facts which we adopt from their reasons for judgment, the Court of Appeal having adopted these facts as found by the District Court.

"The Plaintiffs have alleged and proven:

"That Chevra Thilim Congregation was incorporated on July 27, 1887, by act before William H. Pascoe, notary public, (then referred to as Hebrew Congregation Chebra Thilim) and reincorporated, because of the disappearance of the original act of incorporation, on August 31, 1897, by act before Felix J. Dreyfus, notary public.

"Article III of said charter states the objects and purposes to be:

" 'The objects and purposes of this corporation are declared to be the worship of God according to the orthodox Polish Jewish Ritual, the establishment of a cemetery for the burial of its members and their family and such other persons as may be designated in the by-laws and the practice of charity.' (Exhibit P–1)

"On February 8, 1949, by act before H. L. Midlo, notary public, the said charter was amended and in said amendment it was stated:

" 'Who did further declare that the said mèeting was attended by 150 members, which number of members in attendance exceeds two-thirds of the total membership of the corporation in good standing as of January 12, 1949, the date of said meeting.' (Exhibit P–1)

"That on August 12, 1915, by act before Frederick C. Marx, notary public, Benjamin Rosenberg, a member of Chevra Thilim Congregation, executed a donation inter vivos of the buildings and improvements which he had caused to be erected on the real property located on Lafayette Street in the square bounded by Carondelet, Baronne and Girod Streets, at a cost to said donor of $13,000.00; that said donation was made subject to the following terms and conditions:

" '(A). That the said building and ground shall never be mortgaged or encumbered by any lien or privilege, neither shall same be sold, but if at any time it becomes necessary to sell said building and the property on which same is located then the proceeds derived from the sale thereof shall be immediately reinvested in the purchase of a new site and the erection of a new building, but should the building be destroyed by fire or other causes, then in that event the funds derived from said destruction shall be used to rebuild upon the present site or to acquire a new site and erect a building thereon, provided that in the event of sale and the selection of a new site the same shall only be made upon the approval of at least two-thirds of the mem-

bers of said Congregation, who have been members thereof for at least one year prior to the proposed action being taken.

" '(B). That the said building shall only be used as a place of Jewish worship according to the strict ancient and orthodox forms and ceremonies.

" '(C). That the lower floor or basement may be used for other than religious purposes by the Jewish residents of this City, upon obtaining the consent of the Board of Directors of said Congregation and upon complying with the rules and regulations adopted by the said Board of Directors.

" '(D). That in the event of a new building and site being acquired with the money derived from the sale or destruction of the present building and site, then the said new building and site shall be subject to all of the above terms and conditions, and the said building shall always be called the "Chevra Thilim Synagogue".'

"That Nathan Sherman, President of Chevra Thilim Congregation, accepted the said donation for and on behalf of said congregation, having been authorized by resolution of the membership of said congregation to do so. (Exhibit P–2)

"That at a meeting of the Board of Directors of the Chevra Thilim Congregation held on April 12, 1943, in furtherance of the acquisition and construction of the New South Claiborne Avenue Synagogue (the present location of Chevra Thilim Congregation) a motion was made and unanimously adopted that the congregation receive and accept the South Claiborne Avenue building site from the Uptown Site & Building Fund of Congregation Chevra Thilim, an organization which was not incorporated until March 1, 1944, as evidenced by charter passed before Herman L. Midlo, notary public, on said date, under the following terms and conditions:

" '1. That there shall be constructed on or before the expiration of five (5) years from the date that the Congress or the President of the United States of America shall declare the end of hostilities and peace signed, an appropriate house of worship or synagogue on said parcel of ground for the worship of God according to the Orthodox Polish Jewish Ritual.

" '2. That any and all associations or auxiliaries which shall have use of said real estate and improvements thereon must include as part of their name and style the words: "Congregation Chevra Thilim".

" '3. That the house of worship and synagogue and parcel of real estate shall bear the title of and designation as: "Congregation Chevra Thilim".

" '4. Neither the real estate nor the improvements to be constructed thereon shall ever be sold or exchanged without the joint consent of two-thirds ($\frac{2}{3}$) of the membership of record and two-thirds ($\frac{2}{3}$) of the Board of Directors of record. No repairs,

alterations or improvements shall ever be erected without the necessary cost funds being in the bank to pay for such repairs, alterations or improvements; it being the intention of the donors that this real estate and the improvements thereon shall never be encumbered with any liens, mortgages or privileges'. (Exhibit P–4)

"As will appear by reference to Article II of the Charter of the Uptown Site & Building Fund of Congregation Chevra Thilim, dated March 1, 1944, the objects and purposes of the said corporation are declared to be:

" 'The holding and administering of property real, personal and mixed for religious purposes solely to raise and accumulate funds to build a synagogue on the uptown site purchased and owned by Congregation Chevra Thilim as per acts before the undersigned Notary, dated April 13, 1943 and April 16, 1943, and registered in C.O.B. 524 folio 445 and C.O.B. 526 folio 360, or on any other location in the uptown area of New Orleans.' (Exhibit P–3)

"And in Article VII of the said charter of the Uptown Site & Building Fund of Congregation Chevra Thilim it is stated:

" 'All persons who have and shall contribute funds for the purpose set forth hereinabove in Article II of this Charter, shall have the right to have returned all funds to them or their heirs and assigns

should the project not go into effect in accordance with the resolution of April 12, 1943, of Congregation Chevra Thilim pertinent parts of same read as follows:

" '1. That there shall be constructed on or before the expiration of five (5) years. from the date that the Congress or the President of the United States of America shall declare the end of hostilities and peace signed, an appropriate house of worship or synagogue on said parcel of ground. for the worship of God according to the Orthodox Polish Jewish Ritual.

" '2. That any and all associations or auxiliaries which shall have use of said real estate and improvements thereon must include as part of their name and style the words: "Congregation Chevra Thilim".

" '3. That the house of worship and synagogue and parcel of real estate shall bear the title of and designation as: "Congregation Chevra Thilim".

" '4. Neither the real estate nor the improvements to be constructed thereon shall ever be sold or exchanged without the joint consent of two-thirds ($\frac{2}{3}$) of the membership of record and two-thirds ($\frac{2}{3}$) of the Board of Directors of record. No repairs, alterations or improvements shall ever be erected without the necessary cost. funds being in bank to pay for such repairs, alterations or improvements; it being the intention of the donors that this. real estate and the improvements thereon.

shall never be encumbered with any liens, mortgages or privileges.

"'5. It is understood that the following designated gentlemen have the right to take any and all legal action necessary in order to effect the reversion of the property to the donors, in the event your congregation should not comply with the above conditions:

"'Marx Jeffer, Alternate, Jack M. Pulitser Harry Katz, Alternate, Max Singerman.' (Exhibit P–3)

"The Board of Directors of the Congregation on January 9, 1957, by resolution authorized the institution of family or mixed seating, which resolution reads in part as follows:

"'The following resolution was adopted by the Religious Committee.

"'Whereas the present administration of the Congregation Chevra Thilim was elected on a platform to plan and to implement family seating in the synagogue, and

"'Whereas the Religious Committee believes that this plan must be implemented immediately for the welfare of the Congregation.

"'Therefore be it resolved that the Board of Directors approve the implementation of a family seating plan immediately and that a meeting of the general congregational membership be called as soon as suitable arrangements can be made to register maximum membership sentiment concerning this action.' (Exhibit P–7)

"Thereafter, on January 23, 1957, plaintiffs instituted this suit for injunction as hereinabove set forth.

"It is plaintiffs' contention that the only issue for determination by this court is whether the practice of mixed or family seating in Chevra Thilim Synagogue is contrary to and inconsistent with the 'orthodox Polish Jewish Ritual' and 'Jewish worship according to the strict ancient and orthodox forms and ceremonies', and therefore in violation of the trust and donation imposed by Benjamin Rosenberg in the act of donation hereinabove referred to, the donation by the Uptown Site & Building Fund, and also the Charter of the Congregation.

"The defendants contend that the Board of Directors had the legal right to institute family or mixed seating without the authority of the general membership of the congregation, that is, without a two-thirds vote or any vote of the membership.

"Article VII of the Charter provides that the Charter may be amended, altered or changed by a vote of two-thirds of the members in good standing, and it reads as follows:

"'This charter may be amended, altered or changed, or the congregation may be dissolved, by a vote of two-thirds of the mem-

bers in good standing of said congregation, at a special meeting called for that purpose; provided that the proposed amendment, change or alteration or dissolution shall have been announced at a meeting of said Congregation held prior to the special meeting.' (Exhibit P–1)

"Defendants' contention that an amendment to the Charter was not necessary, but, even if it was, it only required two-thirds of the members present and voting at a meeting, is not sound. Article VII of the Charter means that it requires two-thirds of the entire membership of the Congregation to amend, alter, or change the Charter, and so much so, that on February 8, 1949, when the Congregation amended its Charter by act before Herman L. Midlo, notary public, it placed its own interpretation on this Article when it provided in the said amendment:

" 'Who did further declare that the said meeting was attended by 150 members, which number of members in attendance exceeds two-thirds of the total membership of the corporation in good standing as of January 12, 1949, the date of said meeting.' "

The plaintiffs represent an admitted minority group within the congregation and, in order to enforce their views upon the majority, rely upon the proposition that the governing authority of the corporation has diverted the property of the corporation to uses not contemplated by the objects and purposes of the corporation and to uses in violation of the condition imposed in the Rosenberg donation which they submit did in fact impose a trust upon the corporation, and further upon the conditions in the donation accepted from the Uptown Site & Building Fund of Congregation Chevra Thilim.

◼ In Katz v. Goldman, 33 Ohio App. 150, 168 N.E. 763, 764, a case involving mixed seating, we feel the proper general attitude of Courts in matters of this nature was stated thus:

"It is a well-settled rule of law that courts will not interfere with the ecclesiastical questions involving differences of opinion as to religious conduct, and especially where the members of the congregation in question have created by organic law a tribunal of their own for the settlement of differences, whose finality is supreme judgment."

It seems that many, many years ago there was a Rabbinical Court which made decisions on disputes in doctrine, but the Rabbinical Court was abolished centuries ago, and, the Jews throughout the world since that time, at least here in America, have been organized as independent congregations.

◼ The testimony of the witnesses convince us that the Congregation Chevra

Thilim was autonomous;[1] that it was not allied with any ecclesiastical body having higher authority and able to impose its authority in ecclesiastical matters upon the autonomous Congregation Chevra Thilim, except that in matters of doctrine they were expected, according to some of the experts, to be guided by the opinions of the learned and accepted authorities within their religion. We are impressed, too, that the evidence establishes that the opinion of the Rabbi of the congregation is, in questions of doctrine, to be accorded great weight and, in fact, his learning and training are recognized by all to impose upon him the duty of doctrinal interpretation as one of his primary functions in the congregation.

Article V, as amended, of the Charter of Congregation Chevra Thilim provides "The affairs of the Congregation shall be administered by a Board of Directors * * *" and thereafter follows the constituency of the Board, its term of office, the mode of election, etc.

Thus we observe that plaintiffs are seeking, through injunctive process, to compel the governing authority of the religious

body to desist from pursuing a course of religious conduct which it contends is contrary to the terms of the trust and the charter of the body.

The case of Watson v. Jones, 13 Wall. 679, 20 L.Ed, 666 quoted extensively by the Court below, recognized as a class of litigation, among others, those cases " * * * when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." In regard to this class of cases, being " * * * the case of a church of a strictly congregational or independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government, and to property held by such a church, either by way of purchase or donation, with no other specific trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society.

---

1. Rabbi Agus points out that the 1957 Edition of the Encyclopaedia Britannica, Vol. 3, page 87(a) contains the following: "There is no religious institution more democractic than a local Baptist Church, with the exception of a Jewish synagogue."

See also 76 C.J.S. Religious Societies § 35b, viz.: "Generally speaking, local churches following the congregational form of organization or relationship combine purely for fellowship and retain their individual independence in matters temporal and ecclesiastical."

Section 60a provides: "The determination of questions relating to control and use of property of religious societies depends largely on the form of church government adopted and adhered to, and on constitutional and statutory provisions relative thereto."

"In such cases where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property * * *. This ruling admits of no inquiry into the existing religious opinions of those who comprise the legal or regular organization; for, if such was permitted, a very small minority, without any officers of the church among them, might be found to be the only faithful supporters of the religious dogmas of the founders of the church. There being no such trust imposed upon the property when purchased or given, the Court will not imply one for the purpose of expelling from its use those who by regular succession and order constitute the church, because they may have changed in some respect their views of religious truth."

The basic problem was profoundly stated by the Court in Watson v. Jones, supra, 13 Wall. at page 728, to be:

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and offices within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

So it is noted that the courts of this state have recognized the rule alluded to thus:

"By the great weight of authority the civil courts will not interfere in church government, or discipline, in ecclesiastical or spiritual relation with their members. The church authorities and such tribunals as they may set up for them elves are supreme in all spiritual matters and may arbitrarily expel from membership any individual with or without cause, as long as no civil rights are involved." State ex rel. Johnson v. Tulane Ave. Baptist Church, La.App., 144 So. 639.

In State ex rel. Soares v. Hebrew Congregation "Dispersed of Judah", 31 La. Ann. 205, it was said:

"The entire separation of Church and State is not the least of the evidences of the wisdom and forethought of those who made our national constitution. It was more than a happy thought—it was an inspiration. But although the state has renounced all authority to control the internal management of any church, and refuses to prescribe any form of church government, it is nevertheless true that the law recognizes the existence of churches, and protects and assures their right to exist, and to possess and enjoy their powers and privileges. Of course wherever rights of property are in-

vaded, the law must interpose equally in those instances where the dispute is as to church property as in those where it is not, and it also takes note of, but does not itself enforce, the discipline of the church, and the maintenance of church order and internal regulation. The law does not assume, and will not declare, that a particular religious association is more truly the church than another, but each and all of them are permitted to make their own regulations, and to enforce them in the manner each has provided for itself."

In 45 Am.Jur., Religious Societies, Sec. 40, the doctrine is announced as follows:

"It is well settled that for the decision of questions arising among themselves it is the right of religious unions or associations to establish tribunals therefor, which are courts of peculiar and special jurisdiction. Over a church as such, the legal or temporal tribunals of the state do not profess to have any jurisdiction whatever except so far as necessary to protect the civil rights of persons and to preserve the public peace. All questions relating to the faith and practice of the church and of its members belong to the church judicatories, to which the members have voluntarily subjected themselves, since when a person becomes a member of a church, he be-

comes so upon the condition of submission to its ecclesiastical jurisdiction, and however much he may be dissatisfied with the exercise of that jurisdiction, he has no right to invoke the supervisory power of a civil court so long as none of his civil rights are invaded.

"So long as a professed creed is not subversive of the peace and good order of society, it is not within the province of any department of the government to settle differences in creeds or determine what ought or ought not to be a fundamental of religious belief; courts will not, therefore, investigate and pass upon questions concerning ecclesiastical matters unless it is necessary to do so for the purpose of determining questions of civil or property rights."

The following from American Church Law by Carl Zollmann is considered appropriate to our views:

Sec. 280: "Independent congregations and the general bodies of associated churches are alike in that neither has any spiritual superior. They, however, are not alike in all other respects, but differ in important particulars. Associated churches, being highly organized, naturally soon develop a form of government which becomes settled. Independent congregations on the other hand, being small local democracies, will ordinarily conduct all matters of government by mere majority vote. While, therefore, the courts in the case of associated churches have a system of government by which they can judge whether a majority has acted rightly or wrongly, they generally have, in the case of independent churches, little more than the vote itself to guide their decision. Since unanimity of thought and conduct is a goal which, even if it were desirable to be reached, will forever remain unattainable, it follows that, in independent societies which owe no fealty or obligation to any higher authority, the will of the numerical majority of its members acting legally determines the action of the church upon all questions of church government, and is the law of the church. The right of the separate bodies into which such a church has divided to use the church property must be determined by the principles governing voluntary associations.

"Clear indeed must be the case which will result in setting aside the cardinal principle which lies at the foundation of free government in church as well as in state, viz., the right of the majority to rule. It is the right of a majority to control, in all civil affairs, and not less in the management of the temporalities of a religious society than any other. This is a cardinal principle of our free institutions. It pervades

the whole structure of society. Where men differ in opinion, the will of the majority must prevail. When individuals unite their interest to accomplish a common end, they should expect and be willing that a majority of the associates should govern, in all matters of common interest. They may be supposed to enter the society with the knowledge that they are to be governed by this principle. This principle applies to the Lutheran, Congregational, and Baptist Churches."

We find that the foregoing principle also applies to Congregation Chevra Thilim.

It seems quite clear that the establishment of a church or synagogue and its existence in the United States is not a matter of status. It is not based on residence, or birth, or compulsion, but on voluntary consent. It rests upon faith, "primarily, faith in God and his teachings; secondarily, faith in and reliance upon each other". It is one of contract, and is therefore exactly what the parties make it and nothing more. Membership in such a voluntary organization, therefore, contemplates that those who have sought membership have sought it with full knowledge of the structure of the organization they seek to join; and they have by implication acquiesced in that structure and have agreed to abide by its charter, laws and by-laws, its usages and customs.[2] They subject themselves to the authority of the governing body of those religious organizations.

The Charter and By-Laws of Congregation Chevra Thilim clearly invest in its Board of Directors the authority to manage the affairs of the congregation generally and accords to the members their right to appeal to the congregation from the Board decision and provides the time for so doing and the number of members required to perfect such an appeal.[3]

2. American Church Law, by Carl Zollmann.

3. The By-Laws provide: "Article II—Sec. 1.—A rotating Board of Directors in addition to the officers, shall be elected by the general membership to consist of thirty (30) members; ten (10) members shall serve for one year, ten (10) members for a two year period and ten (10) members for a three year period. The Board shall be headed by the President, and in his absence by the successive Vice-Presidents.

"Sec. 2.—The business of the Congregration shall be transacted in the English language, but the members shall have the privilege of addressing the chair in the Yiddish language.

"Sec. 3.—No member shall be eligible as a member of the Board of Directors unless he has been a member of the Congregation in good standing for two years.

"Sec. 4.—The Board of Directors shall meet at least once a month or as often as the Board may decide it becomes necessary to transact the business on hand.

"Sec. 5.—The Board of Directors shall have the power to suspend or expel any member for improper conduct or the violation of the laws of the Congrega-

Although we are impressed with the sincerity of the plaintiffs and their effort to preserve what they consider to be ancient faith of their predecessors, we are not unmindful of the fact that they are seeking to do so by disregarding the procedure and remedies which they themselves have bound themselves to follow.

LSA–R.S. 12:117, subd. B provides:

"Subject to any limitations, restrictions, or reservations in the articles, the by-laws, or this Chapter, the affairs of the corporation shall be managed by a board of directors of not less than three natural persons. * * *"

The courts of our state have refused to review the action of the board of directors concerning the internal affairs of fraternal or religious organizations. New Founded Industrial Mission Baptist Ass'n v. Anderson, La.App., 49 So.2d 342; Dinkgrave v. Vicksburg, Texas & Shreveport R. R. Co., 10 La.Ann. 514; Cyprian A. Sporl v. Southern Yacht Club, 12 Orleans App. 44, State ex rel. Soares v. Hebrew Congregation, "Dispersed of Judah", supra; State v. Tulane Ave. Baptist Church, supra; 45 Am.Jur., Religious Societies, Sec. 40.

As we said in Katz v. Goldman, supra:

"There must be, in order to grant the relief prayed for, such a perversion and diversion of the original principles and purposes upon which the church was founded as would either partially or totally destroy the institution as a Jewish identity, and while all points of orthodoxy and traditional Judaism may not be carried out according to a unanimity of opinion, yet, so long as the primal elements of these doctrines remain undisturbed as tenets and principles of the Jewish faith, a minority

tion by two-thirds vote of the Board members present.

"Sec. 6.—Seven (7) members of this Board shall constitute a quorum sufficient to transact business.

"Sec. 7.—The office of any member of the Board who shall absent himself from three consecutive meetings, without satisfactory cause, may be declared vacant by the Board. The President shall then appoint a successor for said vacancy for the unexpired term.

"Sec. 8.—The Board of Directors shall have the right to conclude any contract not exceeding one thousand dollars ($1,-000.00). Contracts in excess of that sum shall be confirmed by the Congregation at a general or special meeting of the Congregation. The Board of Direc-

tors shall have the right to transact all business unless restricted by the Charter or By-Laws.

"Sec. 9.—Two members of the Sisterhood shall serve with equal voting privilege on the Board of Directors of the Congregation. One shall be the President of the Sisterhood and the other a representative appointed by the Sisterhood.

"Sec. 10.—Any ten members of the Congregation may appeal to the President from a decision of the Board within fourteen days thereafter. This appeal must be made in writing, addressed to the President, whose duty it shall be to call a meeting of the Congregation within fourteen days from the filing of such an appeal."

differing upon this point is ineffectual. If this were not true, the differences of opinion as to administration in many churches and many religions would be the destruction of the institutions themselves, for it is a matter of common knowledge that difference in opinion in different religious bodies as to the administration of the rules of the church is no uncommon occurrence. The remedy, if the majority power exists, is in the re-election of successors that may conform, or the discharge of leaders whose acts and conduct within the church are not in accord with the dissenting opinion. This rule runs through all organizations, whether civil or religious, and is the underlying principle by which institutions are held together." [168 N.E. 767].

The refusal of state tribunals to monitor the internal affairs of religious bodies in matters of a religious nature is buttressed by the State and Federal Constitutions.

The Louisiana Constitution of 1921, Article I, Sec. 4, LSA, provides:

"Every person has the natural right to worship God according to the dictates of his own conscience. No law shall be passed respecting an establishment or religion, nor prohibiting the free exercise thereof; nor shall any preference ever be given to, nor any discrimination made against, any

church, sect or creed of religion, or any form of religious faith or worship.

The United States Constitution, First Amendment, provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *."

The philosophy underlying the enactment of the foregoing provisions has become part of the American Ideal:

"—The community will tolerate every religion.

"—The state will establish, favor or support no religion.

"—Each man's religion is his own affair.

"—Religious freedom and sanctity of rights of conscience go hand in hand." See "An Almanac of Liberty", by William O. Douglas, p. 210.

■ The Board of Directors, then, as the governing authority of Congregation Chevra Thilim, which is an independent congregation, was established by its Charter and By-Laws as the body empowered to decide upon the "affairs" of the corporate body. That those "affairs" embrace the objects and purposes for which the corporation was organized seems logically to follow. Among the objects and purposes we find "* * * declared to be the worship of God according to the orthodox Polish Jewish Ritual * * *". Clear-

ly, it was within the contemplation of the Charter that the Board of Directors should have authority to ascertain and interpret the meaning of "orthodox Polish Jewish Ritual". We consider their authority to embody this function. Their decisions, insofar as they pertain to matters over which they have been granted authority, should not be the subject of judicial review unless they clearly appear to be arbitrary or capricious, and run counter to good morals or general law, or unless these decisions involve substantial civil or property rights which the courts of this state are charged with upholding. Such a rule reposes in the religious body itself the responsibility for the self-determination of religious question. It upholds and recognizes the contract the parties themselves have made by their charter and by-laws. Only thus can we protect the religious liberty of the members involved. Only thus can courts be spared the exercise of functions which impose upon them the determination of religious doctrines which are properly the function of ecclesiastical bodies.

The plaintiffs argue their main demand is that the court enforce the trust instruments and prevent defendants from circumventing and derogating the conditions set forth in the trust. They contend that the donation inter vivos made by Benjamin Rosenberg was made subject to certain terms and conditions, the most important of which was that "the building shall only be used as a place of Jewish worship according to the strict ancient and orthodox forms and ceremonies." They argue that the donation imposed a trust with specific conditions upon Congregation Chevra Thilim, and that one of the conditions of the trust specified a particular religious doctrine to be adhered to by the beneficiaries of the trust.

They further contend that a second *"donation in trust"* was accepted by Congregation Chevra Thilim on April 12, 1943, when the Board of Directors held a meeting in furtherance of the acquisition and construction of a new synagogue. The resolution of the Board of Directors on the aforementioned date specified that the synagogue to be constructed would be a house of worship or synagogue for the worship of God according to the Orthodox Polish Jewish Ritual, and that Louisiana has by statute recognized the principle of perpetual donations in trust for religious purposes, citing as authority therefor LSA–R.S. 9:2271 et seq.

It is submitted that the implementation of the resolution adopted by the Board of Directors providing for family seating would, if carried into effect, force plaintiffs to abandon worship in the synagogue. This would impair the obligations of the trust instruments and deprive plaintiffs of their interest and property rights in Congregation Chevra Thilim as beneficiaries of the trust.

There is some controversy in this matter concerning an effort which was made and which is being threatened whereby the Board of Directors would, in implementation of its resolution approving family seating, propose an amendment to the Charter which would authorize family seating specifically, although the legal committee which reported to the Board on the subject felt that an amendment to the Charter was not necessary.

■ We deem it unnecessary to decide upon the validity of plaintiff's contention that the trust it contends for exists or that the amendment to the Charter was or was not properly adopted. Our view of this case resolves the controversy by the decision we have reached concerning the meaning of "* * * worship of God according to the orthodox Polish Jewish Ritual", as used in the Charter; "* * * a place of Jewish worship according to the strict ancient and orthodox forms and ceremonies", as used in the Rosenberg donation; and "* * * for the worship of God according to the orthodox Polish Jewish Ritual", as used in the resolution of acceptance of the new site; all referred to hereinabove, and results whether or not the trust theory advanced by plaintiffs is adopted, whether civil or property rights are in fact here involved, and whether or not the revision of the Charter is proper. This decision rests upon a determination of fact as to the meaning of the quoted language and whether the doctrine as expressed above has been substantially breached. Unless such a breach has occurred there can be no reason to enforce a property or civil right even though one does exist.

■■ Our decision here will not affect in any wise the personal liberty of the individual members. They may carry their membership elsewhere. The members are under no compulsion to adhere to the religious doctrine which the Congregation professes, but they cannot impose their belief upon the remaining members where their belief is opposed to the accepted doctrine expressed by the governing authority elected by a majority of the membership. The law of the church is binding upon the membership. It cannot be said that a faith once adopted can be subject to no change whatsoever. There certainly exist in religion, as there exist in all social structures, forces which bring about change in custom, usage and mores. It occurs to us that some change, however gradual, is compatible with progress in all things, whether they are legal, social or religious. To adopt a method of interpretation which would admit of no change would be repugnant to fact, history, and reasonableness itself. The churches must in their very nature "grow with society, and in adaptation to its intelligence and wants, and times and circumstances, and, in so far as they fail in this, they detract from their *social* identity and social life and begin to de-

cay." [4] Should we impose upon the Board of Directors here an obligation which is contrary to this concept? We think not.

Fortified by these principles of law which we consider to govern this case, we turn to a consideration of the evidence.

The evidence shows that on two occasions the proposition of family seating was placed before the membership. On the first occasion, May 2, 1956, less than a majority voted for mixed seating, but on the second occasion, February 24, 1957, subsequent to the filing of this suit, the vote was as follows:

| "Total eligible voters | 322 | |
|---|---|---|
| | Votes | |
| For Family Seating | 193 | |
| Against Family Seating | 68 | |
| Not Voting | 1 | |
| Total Ballots Cast | | 262 |
| For Rabbi Greenberg | 206 | |
| Against Rabbi Greenberg | 51 | |
| Not Voting | 5 | |
| Total Votes Cast | | 262" |

As stated by the Trial Court:

"What the Court is called upon to decide in this case is whether or not the action of the Board of Directors, in instituting family or mixed seating was contrary to and inconsistent with the objects and purposes for which the Congregation was organized and the conditions of the donations made by Benjamin Rosenberg and the Uptown Site & Building Fund of Congregation Chevra Thilim."

It will be noted that the Charter is silent on the matter of family seating, even though in 1887 when the Charter was drafted, and in 1949 when the Charter was amended, that issue was before Orthodox Jewry in this country. That the meaning of Orthodox Judaism is difficult of definition is exemplified in the Charter provision for "orthodox Polish Jewish Ritual", and the clause of the donation providing for "Jewish worship according to the strict ancient and orthodox forms and ceremonies". These provisions involve a choice of words which might conceivably define different doctrines or at least different aspects of the same doctrine. Could Rosenberg expect the Congregation to observe both? During the course of the trial it was revealed that among Jewish religions there are Orthodox-Conservative, Modern Orthodox, Ultra Orthodox and Uncompromising Orthodox. On this subject we find the following testimony in the record by Rabbi Jacob B. Agus of Baltimore, Md., born in Poland in 1911, and, living in the United States since 1927. He is a graduate of both the College and Rabbinical Departments of Yeshivah University, a recognized Orthodox school. He attended the Isaac Elchanan Theological Seminary from which he was ordained. He is a graduate

4. McGinnis v. Watson, 41 Pa. 9, 28.

of Harvard University with the degree of M. A. and Ph. D. in the field of history and religion. He is the author of many books in those fields. He is a consultant in matters relating to Judaism and the history of Judaism for the Encyclopaedia Britannica, being the author on current philosophies of Judaism in Encyclopedia Americana, and the encyclopedia published by the Jewish Scientific Institute. He states:

"A. The word 'Orthodox' as applied to Judaism is of comparatively recent date. There were always differences of opinion in ancient Judaism between, shall we say, reactionaries and liberals; that is, those that went by the letter of the law and those that went to the spirit of the law, but they did not call each other by such names as Orthodox or Reform. It was only in the modern period that a controversy arose and the name came into being. The word 'Orthodox' means right doctrine. Naturally people always say that their own doctrine is the right one and he is Orthodox and the doctrine of the others is the wrong one, or heterodox. Now the meaning of the word 'Orthodoxy', therefore, was determined by the controversies at various times and in various places. In Germany in the twenties the issue was whether sermons may be spoken in another language than Yiddish, which was the Jewish vernacular. The Orthodox were the ones who objected to such use of language and they succeeded in getting the government, the Prussian Government, to support their case. In the thirties, forties, fifties and sixties, down to the eighties, in Poland—in other words a period of 50 years, the issue in Poland was whether Jews may wear garments that are common and used by the general population. The Orthodox Polish people insisted on the use of a certain kind of traditional garment, which need not be described here, which was different from the style prevailing in that country. The government in this case, the Russian Government—Poland was part of it— the Russian government passed decree after decree asking the Jews to accept the garment of the general population. The liberal elements were willing to do that. The Lithuanian Jews accepted the garment of the general population, so did English Orthodoxy and so did German Orthodoxy, but the Polish Orthodox Jews refused to accept this style of clothing prevailing among the general population. They considered it to be a sin to do so. Therefore the word 'Orthodox' over there at the time, in the eighties, had the meaning of objecting specifically to the garments of the general population. The garments also included beards; that is, the ob-

ligation to wear beards, and also not to permit the cutting of the hair on the two sides of the face. Also, it included on the part of the women the obligation to shave their hair and cover their hair with a kerchief or with a shaitel. Now when the Jewish population of Russia began to migrate towards the United States the German Jews were already established in the United States and the German Jews had become largely Reform by the time the Polish Jews had begun to come in masses to the United States. The German Jews were therefore separated from the Polish Jews in two ways; first, by having a German culture rather than a Polish culture, and secondly, by being Reform rather than Orthodox. Now in 1885 the Reform rabbis came together and formulated their principles. This came to be known as the Pittsburg Platform, formulated in Pittsburg in the year 1885. The Pittsburg Platform declared that it is better not to observe kashrus—meaning the dietary laws—that is the Reform Platform maintained you served God better by not observing dietary laws than by observing them. The platform of 1885 also declared that Hebrew was an encumbrance upon the understanding of religion, it was not essential to the practice of prayer and worship, and it also declared that the words 'Zion' and 'Jerusalem' should not have a place in the prayer book. Now all the Jews that did not accept the Pittsburg Platform and organized themselves in opposition to it were at that time called Orthodox. This was beginning with 1885. Thus there was organized in New York the Jewish Theological Seminary, presently of the Conservative movement, but at that time it was organized as one of the Orthodox movements of opposition to the Pittsburg Platform, or the Reform movement. Now from that time on the term Orthodox in the United States came to have several different meanings. Now I list them. First let's say it has a honorific meaning. By honorific meaning I mean a significance in which the person prays as himself; in a way he defines his religion; in other words he says my religion is the one true religion and all other interpretations are wrong and have no place. And now, certainly no one lives up fully to his religion, but whenever people come to a synagogue or a temple they come there not for the purpose to engage in violations but for the purpose of serving God and if, in their synagogues, they adopt certain practices it is because they believe those practices to be right, proper and true and genuine, to be in keeping with authentic Judaism; otherwise they would not come to listen.

"Mr. Gertler:

"Q. Pardon me. Are you saying that as a form of the Orthodox?

"A. That is one of the honorific meanings of the word 'Orthodoxy'. Now this is one meaning of the word 'Orthodox'—it is honorific. In this sense all Jewish interpretations of their religion sincerely meant honorific because it means the right doctrine and their rabbis believe that they are in keeping with the true meaning of Judaism. In addition, the word 'Orthodox' has a general significance and a series of specific or restricted meanings. Its general significance derives from the opposition to the Pittsburg Platform and includes all the Jewish groups that were opposed to the reform movement, of which there were many. In a specific or restricted sense it means a spiral, in which every movement restricts it still further until it comes down to almost a situation where one says 'I am the only one that is true to the faith'. I will begin now the description of the specific Orthodoxy.

"Mr. Weinstein:

"Q. Before going into that I wonder if we could go into the term of Polish Orthodox Jewish ritual in the eighties or nineties, to say what could possibly be meant by that.

"A. That is a good idea. The words 'Polish Jewish Orthodox' do not have

scholarly significance; that is, a scholar would never have used that term, since it is susceptible of so many different meanings; it could have meant Polish as against Lithuanian because of a certain controversy between the Misnagdim and Hasidim. The Hasidim may be described as 'mystics' in general words. Now the Polish Jews were generally Hasidim and the Lithuanian Jews were opposed to it and they put themselves under the ban. It was not just a difference of opinion, but each put the other under the ban. It may have meant this in their minds, this distinction. Also there is a difference in liturgy between the Northern European Jews, Lithuanian-Polish, and the Southern European Jews, Polish-Lithuanian—actually it goes across both—and that difference in liturgy may have been meant. Possibly they meant by the word 'Polish' opposition to the German Jews that were already established in most American cities when the Polish Jews began to migrate to the United States. The Polish Jews came a little ahead of the Russian Jews and after the German Jews, and they must have had something in mind bearing upon this distinction between the practices of German Jews on one hand and Russian Jews on the other hand.

"Q. Now going back to 'Orthodox', would you break down the different sections, or branches or whatever you think they should be called, for the Judge?

"A. I think we might as well begin with the strictest one.

"Q. Are you breaking down Orthodox, or the Jewish religion generally?

"A. I shall break down the meaning of the word 'Orthodox' from its general sense to its restricted sense. Now I said the general sense meant opposition to the Reform Movement in its restricted sense. There was a group— today I am speaking only of those groups that have national associations —the first national association is headed by Satmarer Rabbe—or, his name is Rabbi Teitelbaum of New York. His organization was described here yesterday,—Hisachdus Ho rabbonim. Their rabbis all, without exception, wear beards and their women shave their hair and observe the ritual laws of purity, their children allow their hair to grow uncut, they do not recognize even the State of Israel. This rabbi ordered his followers not to participate in the elections in the State of Israel.

"Q. What is their feeling towards secular education? A. In the United States they accept secular education since it is ordained by law but they try to have their own institutions for it.

"Q. How about their garments?

"A. They wear the old type of Polish Jewish garments. The next one in line—I don't want to get into too many details—the next one in line would be the Union of Orthodox Rabbis of the United States and Canada. This group would declare any synagogue in which there is no bimah or no mechitzoth as unfit to worship in. In a book of theirs which I have right here they declare it to be a sin for a person to shave his beard in any manner, shape or form.

"Mr. Gertler:

"Q. Would you mind giving us the citation, if you please? A. Yes, sir, I will read it.

"The Court:

"Q. You don't have to read it to us entirely, but just give us the authority and the citation and the page, if possible, of the book that you refer to.

"A. The book I refer to is called 'Adus'—meaning testimony—'Leyisorel' —for Israel; published by this organization, Union of Orthodox Rabbis of America in New York. The page number is 146. Now the rabbis belonging to this organization and giving it its status and prestige are generally Euro-

pean-trained, though at present some American trend may be found.

"Mr. Weinstein:

"Q. May I go back to that group? Did they have English services?

"A. I doubt that they would have English services. I doubt it. We go to the next group, the association of rabbis called Rabbinical Alliance. They consist of the graduates of American institutions of learning, but those institutions are two, the Yeshivah University of New York and the Hebrew Theological College of Chicago. Now the rabbis belonging to this group would never accept a synagogue in which a microphone is used, nor would they accept a synagogue in which there is no partition between the sexes, nor a synagogue in which there is no bimah in the center. Next in line there is the Rabbinical Council of America, of which the two rabbis that testified so far were presidents. Within the Rabbinical Council of America there is a constant struggle between the liberal elements and the reactionary elements. I have to use a word in opposition to 'liberal' and I don't know whether * * *

"The Court:

"Q. Go right ahead.

"A. This struggle concerns such issues as whether synagogues with mixed pews shall be served or not; second,

whether rabbis should preach to their congregants that they should stay at home rather than come to the synagogue by the use of a vehicle; whether rabbis of this group should associate with Conservative and Reform rabbis. As I said, on these issues there is a constant struggle and the minority is the liberal group—that is the liberal group, I should say, at present is in the minority. Going beyond this group we enter into the general field called Conservative. The Conservative organizations came into being also under the slogan of Orthodoxy—that is, nearly all the congregations that were organized under the agus of the United Synagogue in 1915 had in their charter the provision that they are Orthodox synagogues. The word 'Conservative' was used by them as a synonym for what they considered to be the Liberal Orthodox position. Within the Conservative movement today there are gradations and variations, but nearly all Conservative rabbis and congregations consider themselves to be true to the tradition and they believe that their practices are in keeping with the teachings of Orthodox Judaism. Now this is so far as the general, and I can go on this specific point now.

"Q. Now, among these groups, do each one of them feel that they are the proper group, or what is the feeling?

"A. It is natural for every group to feel that they have the right interpretation of the faith, except that the fundamental elements say that there is only one interpretation and all the others are just nonsense, and the fundamentalists would say that theirs is the right interpretation and the other interpretations have measures of validity and rightness.

"Q. Does each group claim to be following the halacha?

"A. Each group claims to be following the halacha in accordance with its interpretation.

"Q. Now, using the word 'Orthodox' in the sense of opposing the nineteenth century Reform, will you give us some of the common denominators which exist?

"A. All these groups observe the dietary laws. They all worship with tallis phylacteries. They all use basically the same prayer book. They observe two days of the festivals—that is Passover—shavous and sukkos—and they all emphasize in their schools the importance of loyalty to rituals and the importance of learning the Hebrew language.

"Q. How about in prayer? Do they cover their heads?

"A. They all cover their heads.

"Q. Go ahead.

"A. And I want to go into this specific question of family pews.

"Q. All right—well, back, as to the common denominator—do they all observe the Sabbath?

"A. What do you mean, do they all—

"Q. I don't—do they all believe that the Sabbath should be observed?

"A. There we enter into a difference of interpretation among the several groups. Reform also believes that the Sabbath should be observed, but the differences of interpretation range all the way down. Now insofar as this particular practice of family pews is concerned it is an indication of the different weight that is given by the different groups to form as against spirit. The groups that emphasize external form would naturally insist on anything that is visible to the naked eye as being important and as being the mark of observance. The groups that take account of spiritual values in their interpretation of Jewish law would consider every practice in its history setting and judge its value accordingly. Now this is the general issue. Now insofar as this issue is concerned, I have before me a number of books comprising Jewish codes."

When we find courts inquiring into doctrine for the purpose of enforcing civil or property rights, their enforcement was de-

pendent upon a particular, definite, clearly stated, specific, or express condition creating the trust. See Watson v. Jones, supra; Wallace v. Hughes, 131 Ky. 445, 115 S.W. 684; Ward v. Crisp, 189 Tenn. 513, 226 S.W.2d 273, Katz v. Goldman, supra; Luttrell v. Potts, Ky., 257 S.W.2d 542.

It is true that the evidence is substantial to the effect that family or mixed seating is contrary to and inconsistent with the "orthodox Polish Jewish Ritual" and with "Jewish worship according to the strict ancient and orthodox forms and ceremonies". It is also true that the evidence is substantial to the effect that family or mixed seating is not contrary to the "Orthodox Polish Jewish Ritual" and with "Jewish worship according to the strict ancient and orthodox forms and ceremonies". While plaintiffs introduced seventy-five form affidavits signed by rabbis, a substantial number of whom signed while in attendance at a convention, defendants filed twenty-seven which set forth either that family or mixed seating was being practiced in different congregations throughout the United States and that such a practice is not contrary to Orthodox Jewish forms and ceremonies. Though the number of plaintiffs' witnesses and affidavits may be greater, the content of the testimony and affidavits are not thereby made more impressive than that of defendants. The testimony reveals there are other—perhaps 250—Orthodox synagogues where family seating is practiced. Extreme

perhaps, but nevertheless of a creditable nature, is the testimony of defendants' witness, Isaac Abramson, to the effect that "* * * there is a tremendous amount of dispute, a tremendous amount of uncertainty * * *", concerning what Orthodox Judaism is. The witnesses themselves all professing to follow the Jewish religion sometimes took the oath and sometimes did affirm before testifying because of their religious beliefs. The awareness of the differences which arise in religious matters is heightened by the following excerpt from the testimony of plaintiffs' own witness, Rabbi Solomon J. Sharpman:

> "It is an accepted custom in Jewish law—indeed it is a law that if any individual has a question on diet you are not permitted to ask two rabbis because it is conceivable that even in a question concerning dietary laws two rabbis may differ in a specific detail and nevertheless they might even eat together and discuss their differences and each one would justify each other's opinion * * *".

Appropriate at this point is the following language from Katz v. Goldman, supra:

> "To promote the cause of traditional or orthodox Judaism is not a definite religious doctrine based upon any principle so stationary in its character that a court would be warranted in defining the exact course to pursue * * *". [168 N.E. 765].

If there is one impression which is certain to be had from the evidence, it is that there is severe dispute among Orthodox Jews on the question of family or mixed seating. This case differs from the case of Davis v. Scher, 356 Mich. 291, 97 N.W.2d 137, 144, relied upon by the Court of Appeal, for there the evidence was all on one side. The defendants there, occupying the same position as the defendants here, presented no evidence and did not cross-examine the plaintiff's witnesses. In Davis v. Scher the Court said:

"Here, because of defendants' calculated risk of not offering proofs, no dispute exists as to the teaching of Orthodox Judaism as to mixed seating."

Likewise, in Fisher v. Congregation B'nai Yitzhok, 177 Pa.Super. 359, 110 A.2d 881, also relied upon by the Court of Appeal, there is no discussion or reference to the opposition offered to the proposition concerning separate seating as being a mandate of the Jewish law. We interpret this to mean that the evidence to the contrary, if any, was not substantial.

■ It seems quite clear that there are many Orthodox positions, and that always to the more stringent interpretation the less stringent is not Orthodox. It is reasonable to presume that when Benjamin Rosenberg made the donation in question he was aware of the fact that the ancient Jewish religion had in the past undergone certain changes, modifications or evolutions in its ritual, forms, and ceremonies. It follows that he must have contemplated that such changes would inevitably occur in the future.[5] Realizing as he must have, that the Congregation Chevra Thilim was constituted as a corporation with provisions for the election of a board of directors to govern its affairs, he was charged with the obligation of recognizing that his donation would be administered by that board and subject to its interpretation of the conditions he imposed. In a sense it can be considered that he constituted the board as his arbitrator with respect to the differences among the membership concerning the interpretation of the religious doctrine he referred to in his donation. Had he separate seating in mind as a fundamental tenet, ritual or ceremony of the doctrine ne sought to perpetuate, he did not specify, as he should have done, his intention in sufficiently clear, definite, and express terms. Lacking the clarity and definiteness which would make his terms and conditions susceptible of ready determination, we are not prepared to find that a violation has occurred here which could have the effect of imposing the will of the minority upon the majority. The same applies to the donation by the Uptown Site & Building Fund of Congregation Chevra Thilim and to the

5. State ex rel. Ottolengui v. Ancker, 2 Rich.Law, S.C., 245.

drafters of the Charter. Suffice it to say, the deviation represented by family or mixed seating, if it is such, does not convince us that Congregation Chevra Thilim is no longer an Orthodox Synagogue wherein God is worshipped according to Orthodox Judaism as defined and expressed in the Charter, the Rosenberg donation or the donation of the Uptown Site and Building Fund of Congregation Chevra Thilim. If the Board of Directors sought to divert the property of the Congregation to the use of a religious body entirely foreign to Orthodox Judaism, a different situation would be presented. As was said in Katz v. Goldman, supra:

"The prayer for this Court to adopt a rule by which the congregation in question shall abandon its present administration and conform to the doctrine of traditional Judaism and orthodoxy, even if this legal tribunal had the right to interfere in religious matters, for which provision has been made as to control within the church itself, is incapable of being granted for the reason that every member of the congregation of the church in question might have a different view as to what this doctrine is in all its various phases and with these conflicting opinions it would be impossible to lay down a rule which a board of trustees could follow, because in order to do so the religion would have to be as definite as a science; and, even with respect to a science, it would be impossible to do so, because of the diverging opinions that exist among scientific men upon scientific principles."

Congregation Chevra Thilim and the defendants here continue to profess to worship God according to the Orthodox forms and ceremonies and the record reveals that many of the recognized fundamentals, forms and rituals thereof are observed. It has an Orthodox Rabbi. We are impressed by the statement of the Rabbi of this Congregation and consider that his views are entitled to great weight. They are to the effect that, though the members of said congregation have adopted family seating, he considers them to be following the spirit, traditions and procedure of Orthodox Judaism.

We find that the adoption of the resolution concerning family or mixed seating by the Board of Directors was within the authority provided by the Charter and By-Laws and did not violate the conditions in the donations in question, and is not such action by the Board that would permit this Court to properly interfere.

The judgment appealed from is reversed.

Considering the views we have adopted hereinabove, it is found that the preliminary injunction and permanent injunction were improvidently and improperly granted and the orders granting same are hereby

recalled, vacated and rescinded. Plaintiffs' suit is dismissed at their cost.

HAMITER, Justice (concurring).

In my opinion the plea to the jurisdiction ratione materiae filed in this cause by the defendants is meritorious. An infringement of property, civil or political rights is not in dispute herein. Rather, at issue is merely the defendants' alleged violation of certain precepts important to Jewish worship. The question presented, in other words, relates solely to religious rights. Hence, the controversy is not subject to judicial determination.

Accordingly, I respectfully concur in the decree rescinding the issued injunction and dismissing plaintiffs' suit.